**FIRST NATIONWIDE BANK,
et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–590C.

United States Court of Federal Claims.

April 30, 2003.

Harry M. Reasoner, Vinson & Elkins, Houston, Texas, for plaintiffs. Thomas P. Marinis, Jr., John D. Taurman, John M. Faust, and Gary L. Leshko, of counsel.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Glenn I. Chernigoff, Paul G. Freeborne, Jeffery T. Infelise, Brian A. Mizoguchi, and Brian L. Owsley, of counsel.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*[1] related contract action is plaintiffs' September 26, 2001 motion for summary judgment on damages and plaintiffs' October 7, 2002 motion to strike. Most of the issues raised in the summary judgment motion were resolved in the court's opinion of March 8, 2002. *First Nationwide Bank v. United States,* 51 Fed.Cl. 762 (2002) (*"First Nationwide III "*). The court held oral argument on the remaining issue of plaintiffs' damages on January 21, 2003. For the reasons set out below, plaintiffs' summary judgment motion is granted. Plaintiffs' motion to strike is denied as moot.

## BACKGROUND

The background facts giving rise to this litigation can be found in *First Nationwide Bank v. United States,* 48 Fed.Cl. 248 (2000) (*"First Nationwide I "*); *First Nationwide Bank v. United States,* 49 Fed.Cl. 750 (2001) (*"First Nationwide II "*); and *First Nationwide III.* Familiarity with those opinions is presumed. In *First Nationwide I,* we held (1) that the government was not precluded by undue prejudice or delay from asserting affirmative defenses of accord and satisfaction or release, (2) that the parties' release barred plaintiffs' theories to the extent they were based in any way on alleged breach by the FDIC, and (3) that the release did not bar plaintiffs' claim that the United States breached the implied covenant of good faith and fair dealing. In *First Nationwide II,* we held that the United States breached the implied covenant of good faith and fair dealing and that the tax deductions disallowed by the breach had been actually available. *First Nationwide III* held that the plaintiffs were entitled to recover on a partial restitution theory. We now turn to resolving the amount of damages.

In 1988, the Federal Deposit Insurance Corporation ("FDIC")[2] approached the plaintiffs regarding substantial available tax benefits if they would acquire failing thrifts currently under FDIC supervision. First Nationwide[3] acquired the assets and liabilities of several thrifts at the end of 1988. In connection with this acquisition, the FDIC and plaintiffs entered into an Assistance Agreement.

First Nationwide received two important benefits under this contract. First, § 3(a)(1) of the agreement obligated the FDIC to reimburse First Nationwide for its covered asset losses ("CALs"). A "covered asset" is a thrift asset First Nationwide acquired that

---

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. This opinion uses "FDIC" to refer to both the FDIC and its predecessor organization, the Federal Savings and Loan Insurance Corporation.

3. We use "First Nationwide" to refer to all plaintiffs. The court recognizes that there are several different plaintiffs and that there have been several name changes and reorganizations through the relevant period.

fell within specific classes of assets for which the FDIC agreed to provide coverage against capital losses incurred upon that asset's disposition. A CAL is the amount by which the book value of a covered asset exceeds the proceeds received upon disposition of that asset. The parties agreed that FDIC would reimburse First Nationwide for 90% of any CALs, the so-called "after tax" amount, and retain a 10% share.[4]

The government's 10% share related to First Nationwide's second benefit, its CAL tax deductions. If there was a tax loss on a covered asset, First Nationwide could take a deduction even though it received FDIC assistance for the related book loss. Plaintiffs therefore received, based on the newly-acquired CALs, both tax benefits and FDIC reimbursement payments, resulting in a legislatively permissible "double-dip" for losses on the same asset. The 10% reduction in CAL reimbursement retained by the government was the mechanism by which the tax benefits derived from CAL deductions were shared with the government. *See First Nationwide II*, 49 Fed.Cl. at 753–54. The FDIC retained a 10% share in lieu of having two separate payments—100% of the reimbursement payment from the FDIC to First Nationwide and then one-third of the tax benefits paid from First Nationwide to FDIC. The 10% share represented the FDIC's contractual portion of the CAL tax benefits.[5]

Though FDIC reimbursement normally was triggered by disposition of covered assets, § 4 of the Assistance Agreement allowed First Nationwide to write-down the book basis of covered assets prior to disposition. The FDIC would reimburse First Nationwide for these write-downs but, at this point, the FDIC was not entitled to any 10% share. Under the Assistance Agreement, a write-down was not considered disposition of an asset. When First Nationwide later disposed of these assets, prior write-downs were ignored in calculating FDIC "after tax" reimbursements pursuant to § 3(a)(1) of the Assistance Agreement. First Nationwide then offset the amount of the write-down back to the FDIC under § 3(b)(10). If the write-down was greater than the "after tax" reimbursement, then First Nationwide was required to pay the difference back to the FDIC.[6]

The Assistance Agreement also required First Nationwide to pay the FDIC for covered asset recoveries, which occurred when the amount of net proceeds upon disposition of a covered asset exceeded its book basis. Essentially, covered asset recoveries are gains on covered assets, as opposed to losses (CALs). For covered asset recoveries, First Nationwide paid the FDIC the "after tax" amount—90% of the gain—under § 3(b)(2) of the Assistance Agreement. First Nationwide retained a 10% share.

Congress passed the Guarini legislation[7] in 1993, rendering the CAL tax deductions retroactively unavailable back to March 1991 and thereby breaching the implied covenant of good faith and fair dealing. The contract stayed active, however, rendering the government's retained 10% share vestigial—the tax benefits were no longer available, but the retention continued. In the absence of tax

---

4. For example, if a covered asset had a book basis of $1000 and was sold for $900, there would be a CAL of $100. The FDIC would reimburse First Nationwide 90% of this loss ($90) and retain 10% ($10).

5. Following the example in footnote 4, *supra*, if we assume that, as was frequently the case, tax basis was equal to the book basis ($1000), then, before the breach, First Nationwide would have deducted the $100 tax loss upon the $900 disposition of the asset. Using the parties' assumed contractual tax rate of 30%, the CAL deduction would generate $30 in tax savings. The FDIC's already-retained 10% ($10) represented its contractual one-third share of the CAL tax benefits.

6. Continuing with the example in footnote 4, *supra*, if there had been a write-down of $120 prior to disposition, the FDIC would pay First Nationwide $120. Upon disposition of the asset, however, First Nationwide would owe a net $30 to the FDIC (the $120 write-down payment minus the proper reimbursement credit of $90). In this case, the entire CAL would be deductible because, in the end, there was no direct FDIC reimbursement for a CAL, only an FDIC payment pursuant to a contractual write-down.

7. This legislation, the Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66, § 13224 (1993), is named for its primary sponsor, Representative Frank Guarini.

deductions for CALs, no reason existed to share proceeds from the CAL-based deductions, even though the parties continued to implement the Assistance Agreement as before. The FDIC continued to make reimbursement payments to First Nationwide for CALs in the 90/10 ratio mandated by the contract until the parties terminated the Assistance Agreement in 1996.

Plaintiffs here claim restitution of the 10% share of CAL reimbursement retained by the FDIC after passage of the Guarini legislation. Plaintiffs' claim totals $70,018,647.

## DISCUSSION

In support of their motion for summary judgment, plaintiffs rely on multiple declarations of Richard P. Hodge, a CPA since 1982 and Executive Vice President of California Federal Bank.[8] Mr. Hodge was asked to calculate plaintiffs' damages, the amount of the FDIC's retained 10% share of CALs rendered non-deductible by Guarini. This 10% represents tax-sharing payments from First Nationwide to the FDIC which, after Guarini, were unearned.

The first step in Mr. Hodge's calculation was to ascertain the total amount of "after tax" (90%) reimbursements paid to First Nationwide post-Guarini. Even though the CAL tax benefits were negated by Guarini, the Assistance Agreement still directed payments between the parties. Therefore, the FDIC reimbursed plaintiffs 90% for book losses on covered assets. These payments, credited through the various Special Reserve Accounts created under the Assistance Agreement and thoroughly audited by the FDIC, represent the starting point for the plaintiffs' calculation. Mr. Hodge computed the total "after tax" reimbursement for CALs post-Guarini at $1,298,881,577. This figure reflects only reimbursements respecting covered assets disposed of after Guarini.

Mr. Hodge next made two separate reductions. First, he subtracted FDIC reimbursements which were offset by pre-Guarini write-downs. Then, he reduced that subtotal because some post-Guarini CAL reimbursements did not convert a deductible loss into a non-deductible loss pursuant to Guarini. Instead, these reimbursements generated non-taxable gains. These two types of reductions are discussed in turn.

To the extent that reimbursement was credited pre-Guarini due to write-downs of assets, it resulted in less post-Guarini reimbursement. Only the net post-Guarini reimbursement resulted in the loss of tax benefits to plaintiffs. Therefore, Mr. Hodge excluded any part of the FDIC's 10% retained share that corresponded to write-downs and not reimbursement. If the write-down exceeded the "after tax" reimbursement, Mr. Hodge excluded all of the FDIC's 10% share corresponding to that asset. After excluding these write-downs, Mr. Hodge's calculation of post-Guarini "after tax" reimbursement was $682,635,347.[9]

Mr. Hodge also reduced the plaintiffs' damages for non-taxable gains. In two different situations, CAL reimbursements from the FDIC generated non-taxable gains on some assets. Reimbursements for these assets were excluded from plaintiffs' damages to the extent that they generated a non-taxable gain because, in those circumstances, Guarini did not convert an otherwise deductible loss into a non-deductible loss. Mr. Hodge reduced plaintiffs' damages for both types of tax gains, as discussed below.

One circumstance in which there were non-taxable gains was when the tax basis of an asset was lower than its book basis. Pre-

---

8. California Federal Bank is the current name of the thrift institution formerly known as First Nationwide Bank.

9. To illustrate using the example in footnote 4, *supra*, we assume now that there was a $45 book write-down of the asset before Guarini. This write-down resulted in a $45 right of reimbursement from the FDIC to First Nationwide. When the asset was sold, assume a book and tax loss of $100. The FDIC would credit $90 to First Nationwide, as before, and retain $10. Because of the prior write-down, however, there would only be a net $45 payment from the FDIC. In this example, post-Guarini, only the portion of the CAL which the FDIC reimbursed would have been disallowed ($45). The other $45 was written-down prior to Guarini and remained deductible. Plaintiffs may claim only the same percentage of the 10% retained share as Guarini disallowed. In this case, the correct ratio is half ($5).

Guarini, plaintiffs were allowed to ignore FDIC assistance in computing tax consequences. Post–Guarini, FDIC reimbursement was added to the income earned on disposition of an asset. This aggregate income, if greater than the tax basis of the asset, could transform a tax loss into a nontaxable gain. Therefore, Guarini functionally disallowed whatever tax loss had been available. In some cases, the tax loss disallowed by Guarini was only fractionally related to the government's retained 10% share. As a result, for this class of assets, plaintiffs are only entitled to claim part of the FDIC's retained portion as restitution for Guarini.[10]

The other type of non-taxable gains generated by Guarini relate to former subsidiaries of First Nationwide. One of these, Centennial Mortgage Corporation ("CMC"), owned assets covered by the Assistance Agreement. Mr. Hodge accounted for FDIC reimbursement received upon disposition of these assets as proceeds of First Nationwide's investment in CMC. The FDIC reimbursement, therefore, was added to other proceeds to determine total gross proceeds on the disposition of the assets. The gross proceeds, being higher than the assets' tax basis at disposition, result in non-taxable gains. Accordingly, FDIC "after tax" reimbursements included in the plaintiffs' damages calculations should be reduced to the extent that the proceeds of each investment, including FDIC reimbursements, exceeded First Nationwide's tax basis in each subsidiary. Only

that portion of FDIC reimbursement which correlates to disallowed tax losses should be included.[11] After offsetting the plaintiffs' calculation for these nontaxable gains, Mr. Hodge found that $630,167,826 of FDIC "after tax" reimbursement correlated to disallowed deductions post-Guarini.

The last step in plaintiffs' calculation was to compute the 10% share retained by the FDIC that corresponds to these "after tax" reimbursement payments. The Assistance Agreement fixed the ratio at 90% for FDIC reimbursements and 10% for tax sharing. Mr. Hodge multiplied the adjusted proper FDIC "after tax" reimbursements by one-ninth (10% divided by 90%) to find the FDIC's improperly retained share. Plaintiffs therefore claim $70,018,647 in damages.

In response, the government offers the reports of its expert, Mr. William F. Wolf. Mr. Wolf has thirty years of experience in public accounting and is a tax accounting partner with White, Zuckerman, Warsavsky, Luna & Wolf, certified public accountants. He criticizes Mr. Hodge's calculation in seven respects and calculates that plaintiffs' damages should not exceed $25,030,617. None of Mr. Wolf's criticisms raise questions of fact and we discuss each in turn.

1. Adjustment for Book/Tax Basis Differences

Mr. Wolf first argues that the plaintiffs have understated the amount of differences

---

10. Using the example in footnote 4, *supra,* we now assume that the book basis of the asset is $1000 and the tax basis is $940. Assume the asset generates $900 at disposition. There is a $100 book loss, but only a $40 tax loss. Under the Assistance Agreement, the FDIC would pay 90% of the book loss ($90) to First Nationwide and retain 10% ($10) for tax sharing. Before Guarini, First Nationwide would report a $40 tax loss ($900 of income minus $940 tax basis). Post–Guarini, however, First Nationwide would report a $50 non-taxable gain ($990 of total income minus $940 of tax basis) without any tax loss. Instead of the full tax loss anticipated by the $90 FDIC payment, Guarini eliminated only a $40 tax loss. Based on this discrepancy, it is appropriate to include only a pro-rated portion of the FDIC's retained 10% share in the plaintiffs' damage calculation. The proper ratio of the FDIC's wrongly retained share is determined by the ratio of plaintiffs' denied tax loss ($40) divided by FDIC reimbursement ($90). This ratio (4/9) is then applied to the FDIC's retained

share ($10) to produce the wrongfully retained portion subject to plaintiffs' restitution claim. In this example, only $4.44 of the FDIC's retained share would be subject to plaintiffs' restitution claim.

11. For example, the tax basis of CMC at sale was $12.51 million. First Nationwide received $57.33 million in "after tax" reimbursement along with $0.42 million in other proceeds from the sale. These figures produce a non-taxable gain to First Nationwide of $45.24 million ($57.33 plus $0.42 minus $12.51). Mr. Hodge's starting point in his damages calculations is the $57.33 million of FDIC reimbursement, but he finds that $45.24 million of this amount does not properly correspond to tax deductions denied by Guarini. Therefore, for CMC, plaintiffs claim that $12.09 million of reimbursement and then, applying a nine-to-one ratio, the $1.34 million retained by the FDIC properly correlates to disallowed deductions for tax-sharing purposes.

between book basis and tax basis of covered assets. If true, this understatement would reduce the tax basis of assets which, in turn, would reduce the plaintiffs' damages. Specifically, Mr. Wolf argues that Mr. Hodge should have included an extra $454 million of book/tax differences. He derives his figure from a series of interactions between First Nationwide and the FDIC.

The FDIC filed receivership returns for the failing thrifts until plaintiffs acquired them in 1988. In 1993, the FDIC amended its final receivership returns to charge-off $454 million of book reserves. During subsequent negotiations for early termination of the Assistance Agreement, however, the FDIC realized that its 1993 amendment would obligate it to pay substantial adjustments under the agreement. The FDIC re-amended its receivership returns in 1995 and reversed its position.

After the termination agreement negotiations broke down in 1996, unrelated litigation ensued between First Nationwide and the FDIC. First Nationwide then amended its 1988 income tax returns to take $454 million in additional charge-offs. This amendment paralleled the FDIC's 1993 amendment to its receivership returns. First Nationwide's charge-offs lowered the tax basis and increased the book/tax difference of assets at acquisition. This amendment also increased the FDIC's reimbursement obligations to First Nationwide. The lawsuit ended with a Settlement and Termination Agreement in August 1996. In accordance with that settlement, the FDIC paid First Nationwide $13 million and First Nationwide re-amended its 1988 tax return to reverse its $454 million in claimed charge-offs. Currently, plaintiffs' tax reporting is based on returns reflecting the final receivership returns as originally filed.

Mr. Wolf believes that First Nationwide, in this litigation, should be required to incorporate its prior charge-off claims into its current damages calculations. This would reduce "after tax" reimbursements by $107.3 million and reduce the plaintiffs' damages by $11.9 million. According to Mr. Wolf, First Nationwide's reversal of $454 million in charge-offs should be disregarded as con-

trary to its intended tax treatment: "To claim the $454 million book/tax difference for [reimbursement] purposes, and not for tax return purposes, is inconsistent and would result in receipt of the 10 percent FDIC payment twice for the same item (once under Assistance Agreement § 3(a)(13) and again under this litigation.)."

In the alternative, Mr. Wolf believes that if First Nationwide is not required to incorporate these charge-offs, then plaintiffs should be required to offset damages by the portion of the settlement which pertained to the book/tax issue. Mr. Wolf interprets the settlement and $13 million payment from the FDIC as implicit acceptance of some portion of First Nationwide's claimed charge-offs. Accordingly, he uses the portion of the settlement payment attributable to resolution of the charge-off issue as if the FDIC had allowed some portion of the charge-offs. Mr. Wolf uses an FDIC memorandum to divide the settlement payment into 97.5% related to the book/tax dispute and 2.5% for an unrelated issue. Those charge-offs "allowed," according to Mr. Wolf, should apply to reduce "after tax" reimbursements relevant to this action. By this method, Mr. Wolf would reduce damages by around $4 million.

 We disagree with both of Mr. Wolf's suggestions. We first reject Mr. Wolf's proposal that we should use superseded tax returns instead of the plaintiffs' current returns. In fact, plaintiffs never took the charge-offs. In essence, Mr. Wolf makes an argument for judicial estoppel, which disallows litigants from taking inconsistent positions. See *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 665–66 (Fed.Cir.1988). This doctrine may be invoked to prevent inconsistent positions when the party receives a benefit from its earlier position in the form of a judicial success. Settlements, specifically, do not provide the necessary judicial success for invocation of judicial estoppel. "A settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel." *Id.* at 666 (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir.1980)).

Because First Nationwide's prior litigation was settled, we cannot invoke judicial estoppel, even if we assume that First Nationwide took an inconsistent position in that litigation. The court cannot go behind the settlement in an attempt to reconstruct which positions merit judicial endorsement. We may only attempt to resolve issues and positions actually taken in court. We rely on the positions taken here by the parties and the tax returns of the plaintiffs as actually filed.

We also reject Mr. Wolf's proposal that we should apportion the government's settlement to offset damages. In effect, Mr. Wolf asks us to find that the settlement was evidence that First Nationwide prevailed in its prior litigation. Courts, however, do not use settlements in this way. *See Sternberger v. United States*, 185 Ct.Cl. 528, 538, 401 F.2d 1012 (1968) ("An offer in settlement is ordinarily not admissible, for it is deemed to be an indication only of a desire for peace and not an admission."); Fed.R.Evid. 408 (evidence of settlement is not admissible to prove validity or invalidity of the claim or its amount). We cannot in any meaningful way divide a settlement payment among the issues thereby resolved. Nor can we use a prior settlement agreement to allocate fault between the parties.

### 2. Acceleration of Post–Guarini Charge-offs

Mr. Wolf next offers his opinion that First Nationwide could have avoided Guarini by using amended tax returns to accelerate its CAL tax charge-offs into pre-Guarini years. First Nationwide, in reality, took a substantial portion of its CALs after Guarini. To show that plaintiffs were able to accelerate charge-offs, Mr. Wolf again spotlights the 1996 litigation between First Nationwide and the FDIC regarding $454 million in charge-offs that plaintiffs attempted to accelerate. Mr. Wolf says that if plaintiffs had accelerated all losses to the maximum extent possible, post-Guarini FDIC reimbursements for which a deduction was unavailable would be limited. Plaintiffs, according to Mr. Wolf,

effectively would have been able to avoid some of Guarini's effects.

Even if we assume that Mr. Wolf's hypothetical accelerated charge-offs would have survived both IRS audit and enforcement of the Guarini legislation,[12] his theoretical adjustment to the plaintiffs' claim fails as a matter of law. Mr. Wolf, in essence, is making an argument based on failure to mitigate—an affirmative defense which the government has not raised.

In any event, the critique fails on the merits. Mitigation does not require the non-breaching party to take all actions possible to avoid damages from a breach. Instead, it only requires that "reasonable" actions be taken. *See, e.g., Koby v. United States*, 53 Fed.Cl. 493, 496–97 (2002). Furthermore, the breaching party has the burden of proof on a failure to mitigate defense. *See, e.g., Brazos Electric Power Cooperative, Inc. v. United States*, 52 Fed.Cl. 121, 128 (2002). A statement in *In re Kellett Aircraft Corp.*, 186 F.2d 197 (3d Cir.1950), is directly on point: "The rule of mitigation of damages may not be invoked by a contract breaker ... merely for showing that the injured person *might have* taken steps which ... would have been more advantageous to the defaulter." *Id.* at 198–99 (emphasis added). Mr. Wolf goes to great lengths to show that First Nationwide *might have* acted to reduce its damages. In his deposition, however, he explicitly disavows any opinion that plaintiffs *should or could have* accelerated their charge-offs. Plaintiffs are entitled to a presumption that they took into account all legitimate and reasonable business factors in preparing their tax returns. Without any elaboration by defendant regarding the reasonableness of Mr. Wolf's alternate transaction as compared to plaintiffs actual actions, defendant's failure to mitigate claim fails as a matter of law.

### 3. Allowable Bad Debt Reserve

Next, Mr. Wolf attacks First Nationwide's application of its bad debt reserve. The bad debt reserve accounting system allows an

---

**12.** First Nationwide disputes this assumption. Plaintiffs argue that accelerating charge-offs to foil Guarini would, at a minimum, have been

aggressive, if not clearly disallowed as inconsistent with the intent of the legislation.

entity some flexibility in scheduling deductions. The entity can forecast losses on assets and add those predicted losses into its bad debt reserve. This results in a tax deduction under I.R.C. § 593. Later, it may charge-off these assets and lower the reserve. Though at any one time the reserve might be positive or negative, over the full life of an entity total additions and charge-offs must equal zero.

Mr. Wolf theorizes that plaintiffs could have anticipated Guarini and made additions to the bad debt reserve for CALs before March 1991. This anticipation would have allowed plaintiffs to take deductions for covered assets before Guarini was adopted. Plaintiffs then would have obtained FDIC reimbursement when they disposed of the assets after Guarini. Because the plaintiffs use FDIC reimbursement as the starting point for damages, this series of transactions might result in a claim for damages without a precise correlation to disallowed deductions. Therefore, according to Mr. Wolf, plaintiffs' damages may be overstated. He contends that plaintiffs are claiming that the FDIC improperly withheld its 10% share with respect to assets for which deductions had actually been taken.

In an effort to compute the economic effect of his criticism on plaintiffs' damages, Mr. Wolf attempts to determine the portion of First Nationwide's bad debt reserve which related to covered assets as of December 1990 (as close to the breach dated March 1991 as possible). In 1990, First Nationwide's bad debt reserve stood at $143.4 million. Based on this bad debt reserve balance, Mr. Wolf "conservatively" estimates that First Nationwide has anticipated bad debt deductions, pre-Guarini, which relate to

post-Guarini reimbursed CALs in the amount of $131.6 million. Mr. Wolf would reduce damages by over $13 million, but he admits that it is not possible to calculate this value with any certainty.

Mr. Wolf's criticism is misplaced. Though Mr. Wolf is correct that post-Guarini FDIC reimbursement may not directly correlate to disallowed deductions, Guarini did affect these transactions in a way that indirectly disallowed plaintiffs' future deductions. Though Guarini did not affect the FDIC's reimbursements to plaintiffs for losses already anticipated by additions to the reserve, Guarini did prevent charge-offs for these reimbursed CALs starting in 1991. The net effect was the same. First Nationwide could not lower its bad debt reserve when it disposed of covered assets after Guarini. Because First Nationwide could not use losses on covered assets to lower the reserve, these disallowed charge-offs also prevented future deductions, equivalent in value to the additions to the reserve from anticipated CALs. Guarini precluded plaintiffs from deducting CALs, even though the specific deductions highlighted by Mr. Wolf were not disallowed.[13] These precluded deductions still correlate to the FDIC's improperly retained 10% share and properly are included in plaintiffs' damages model.

### 4. Subsidiary transaction problems

■ Mr. Hodge and Mr. Wolf treat one group of covered assets separately because they were not owned directly by First Nationwide. Instead, they were owned by First Nationwide's former subsidiaries.[14] The FDIC reimbursed First Nationwide for losses on these assets and the parties dispute the tax treatment of these CALs. Specifically,

---

13. For an example using the numbers from 1990, we note that plaintiffs ended with a bad debt reserve level maximized at $143 million. Assuming that the maximum level of the bad debt reserve remained constant, First Nationwide, in 1991, could only make additions to the reserve in the amount of its charge-offs. Hypothetically, if First Nationwide had $143 million in charge-offs, it would be allowed to take $143 million in deductions to return the bad debt reserve to its maximum. When Guarini disallowed charge-offs for reimbursed CALs, it lowered total potential charge-offs for 1991. Reducing these potential charge-offs also reduced

permissible deductions, because, in our example, deductions equaled charge-offs. If Guarini prevented $100 million of 1991 charge-offs, then First Nationwide could add only $43 million to the bad debt reserve, resulting in only $43 million of deductions.

14. The relevant subsidiaries include Centennial Mortgage Corporation, HSA Financing, Inc., Greenspoint Trailer Park, Inc., NDC, Inc., Huntingdon Development Corp., and Imperial Advertising of Texas.

defendant questions whether the CALs were deductible even in the absence of Guarini. If defendant is correct, then plaintiffs would not be entitled to the FDIC's share of reimbursement for these already non-deductible losses. One subsidiary in particular, CMC, contributes the bulk of the losses for plaintiffs. Mr. Wolf, in a very confused and confusing presentation, suggests four different reasons why First Nationwide could not have deducted these losses. We find none of them persuasive.

### (a) Tax Basis

Mr. Wolf first alleges that First Nationwide's tax basis in CMC is lower than plaintiffs suggest.[15] If true, it would increase First Nationwide's recognized gains on CMC stock and decrease the restitution award. Mr. Wolf lists several perceived problems with CMC's tax basis including legal errors and internal inconsistencies with the returns.

This, however, is not a tax case; it is a contract case involving tax benefits. The court is not at liberty to critique plaintiffs' tax returns. Mr. Wolf is free, of course, to criticize different aspects of plaintiffs' accounting, but this litigation is not the proper forum for the government to re-write plaintiffs' final returns. We simply use numbers from the returns to calculate the damages due in this case. The proper vehicle for challenging plaintiffs' returns was an IRS audit.

### (b) Triple-dip

Second, Mr. Wolf suggests that plaintiffs improperly attempt to "triple-dip" by claiming damages related to the subsidiaries' assets (FDIC reimbursement plus *two* CAL deductions). Initially, CMC deducted its losses on covered assets. According to Mr. Wolf, plaintiffs' current restitution claim presupposes an improper *second* deduction derived from these same assets.

We disagree. First Nationwide is not claiming a second deduction based on CMC's assets. The parties agree that CMC deduct-

ed its CALs because Guarini did not apply to subsidiaries. When CMC deducted these losses, the Assistance Agreement mandated that the FDIC continue to reimburse First Nationwide for its subsidiary's losses. First Nationwide, however, reduced its basis in CMC stock to account for CMC's deducted CALs. When First Nationwide sold CMC in 1995, the tax basis of its stock was already reduced by CMC's utilized losses. This reduction in basis prevented First Nationwide from taking a second deduction based on the same assets. In fact, when First Nationwide sold CMC, the total proceeds derived from that sale resulted in a substantial tax *gain*, because of the prior reduction in CMC's tax basis. Plaintiffs only seek restitution to the extent that Guarini reduced its otherwise deductible loss. Without Guarini, they would not have had to include the FDIC reimbursement as proceeds, so these additional proceeds converted an otherwise deductible loss into a substantial tax gain.

### (c) Tax Disallowance Rules

Third, Mr. Wolf argues that 26 C.F.R. § 1.1502–20 limits losses on the sale of subsidiary stock and would have prevented plaintiffs from taking deductions for these losses. If true, then Guarini would not have caused plaintiffs' damages. According to Mr. Wolf, § 1.1502–20 limits deductions of the loss on a sale of a subsidiary in a consolidated tax return by an amount not exceeding the sum of extraordinary gain dispositions and positive investment adjustments. He computes that plaintiffs had positive income adjustments of $9,607,991 and that § 1.1502–20 should have reduced plaintiffs' subsidiaries' potential pre-Guarini deductions. The court, therefore, should disallow any restitution claim related to these illusory deductions.

At oral argument, however, defendant withdrew Mr. Wolf's theory in light of new regulations. *See* Temp. Treas. Reg. § 1.1502–20T (2002) and Temp. Treas. Reg. § 1.337(d)–2T (2002). Defendant admits that

---

**15.** First Nationwide revised CMC's tax basis after Mr. Wolf's initial report. Mr. Hodge's second revised declaration reduces CMC's tax basis from $41.5 million to $12.5 million. Neither plaintiffs nor defendant offer a specific rationale for this change. Therefore, the court does not know if plaintiffs' current damages calculation incorporates some of Mr. Wolf's criticisms.

the new loss disallowance rules allow plaintiffs to take these deductions.

### (d) Attribute Reduction and COD Income "Wash"

Fourth, Mr. Wolf argues that, under the consolidation rules, subsidiaries' CALs should have been offset for tax purposes by either cancellation of debt income or by attribute reduction, depending on whether the subsidiary was insolvent. He argues that even without Guarini, these losses would be a "wash" and not deductible. Therefore, he says, these losses should be excluded from the restitution calculation because Guarini did not cause plaintiffs to lose these deductions.

We disagree. Mr. Wolf is correct that, for the subsidiary, cancellation of debt income or attribute reduction should offset losses on covered assets. The subsidiary's return should include a deduction for the CAL and some type of offsetting income, producing a "wash." For the overall consolidated return, however, Guarini forced First Nationwide to offset the CAL by the amount of FDIC reimbursement. Guarini did not have an effect on the subsidiary's return, but it effectively disallowed CALs for the entire consolidated entity. There was no "wash" to the consolidated entity.[16] Certainly, the FDIC recognized losses and agreed to reimburse First Nationwide for them.

### 5. Covered Asset Recovery Offset

■ Mr. Wolf next argues that covered asset recoveries paid by First Nationwide to the FDIC under § 3(b)(2) of the Assistance Agreement should offset part of plaintiffs' damages calculation. Covered asset recoveries occur when the net proceeds from disposition of a covered asset exceed book basis for that asset. In those circumstances, First Nationwide was required to pay 90% of this difference to the FDIC and was allowed to retain a 10% share. For tax purposes, First Nationwide offset its covered asset recoveries against its book gain as a cost of sale. This approach allowed First Nationwide to treat its covered asset recoveries as nontaxable.

Mr. Wolf argues that "[s]ymmetry to the underlying justification for [First Nationwide]'s claim for restitution requires that the restitution claim be reduced by the 90 percent covered asset recoveries (gains) not claimed [by First Nationwide] as taxable income." He claims that the parties expected that the 10% retention would be used to pay tax liability on covered asset recoveries. Defendant uses the affidavit of Mr. James A. Meyer as evidence that the parties *expected* plaintiffs to include their covered asset recoveries as taxable income. Because First Nationwide was not paying tax on this amount, offsetting this income against book gain as costs of sale, Mr. Wolf claims that plaintiffs were improperly retaining their 10% retained share. This share, he argues, is analogous to the 10% share that, after Guarini, the FDIC improperly retained. Therefore, whereas plaintiffs claim damages for each 10% share improperly retained by The FDIC, Mr. Wolf reduces plaintiffs' damages for each 10% share he finds that First Nationwide improperly retained.

We disagree. Even assuming that the parties expected that the covered asset recoveries were fully taxable, the award here should not be offset by the 10% retained share because the contract was divisible and the contract's covered asset recovery provi-

---

**16.** For example, assume a parent lends a subsidiary $100, and the subsidiary loses the $100, creating a current-period loss. The current-period loss then goes unused because neither the parent nor the subsidiary has current taxable income. Thus, the current loss becomes a $100 net operating loss carry forward ("NOLC"). If the subsidiary becomes insolvent and its loan is written off by the parent as worthless, the subsidiary has cancellation of debt income of $100 that is excluded and must reduce its attribute (the $100 NOLC) by $100. The net tax effect on the subsidiary is zero, because its $100 NOLC was reduced to zero through attribute reduction. The parent, however, maintains a bad debt deduction of $100 based on the worthlessness of the subsidiary's debt. Absent Guarini, the $90 FDIC reimbursement correlating to the parent's $100 CAL would not affect the deductibility of the $100 loss. Post–Guarini, on the other hand, the $90 reimbursement would leave the parent with only a $10 deductible loss, but the subsidiary would still have $100 in income which would eliminate its NOLC. Guarini, therefore, reduced the parent's ability to deduct its CAL.

sion was not breached. In *First Nationwide III*, we held that plaintiffs were entitled to partial restitution with respect to those "separate provisions" and "separate transactions" within the Assistance Agreement affected by the government's breach. 51 Fed.Cl. at 769–70. Though both provisions deal with dispositions of covered assets and both provide for a 90/10 split, they are distinct. Unlike CALs, there is no link between Guarini and covered asset recoveries. Prior to the Guarini legislation, the FDIC's retained 10% share of CALs was proper under the Assistance Agreement. After Guarini, this share was improperly retained. The same is not true with respect to covered asset recoveries.

Furthermore, there is no link between covered asset recoveries and CALs. Though either may occur upon disposition of an asset, the two are treated differently and arise under distinct parts of the Assistance Agreement. For example, adjustments are made to the FDIC's 10% share of CALs when the tax basis is lower than the book basis[17] or when the tax basis is higher. These adjustments ensure that the parties were properly sharing tax losses instead of book losses. No such adjustments were made for covered asset recoveries. Moreover, the Assistance Agreement required a minimum $30 million tax benefit sharing payment, per annum, from First Nationwide to the FDIC. The FDIC's 10% retained share of CALs are factored into this tax sharing mechanism. First Nationwide's 10% retained share of covered asset recoveries were not included.

Our opinion in *First Nationwide III* discussed the parameters of the plaintiffs' partial restitution claim. We specifically held that, in considering restitution, it was appropriate only to "bracket the provisions of the Agreement dealing with tax benefits ... because the government's breach was narrow."

*First Nationwide III*, 51 Fed.Cl. at 769. "[T]he contract, insofar as reimbursement, tax benefits, and tax sharing were concerned, operated independently of the rest of the Agreement, and consisted of a series of separate transactions." *Id.* at 770. Furthermore, First Nationwide claims only partial restitution instead of expectancy, which might have increased its potential damages.[18] We decline to expand the breach to include provisions not directly impacted or affected by Guarini.

### 6. Taxability of the Award

Mr. Wolf believes that any award should be reduced by 37%, his calculated marginal tax rate, to account for the possibility that any recovery might not be taxed. Though Mr. Wolf agrees with plaintiffs that the award would in fact be taxable, he expresses concern that plaintiffs later may argue otherwise. He believes that plaintiffs might explain that the award was meant to substitute for FDIC assistance that First Nationwide should have received. Because FDIC assistance is nontaxable under I.R.C. § 597, the award that substitutes for it might also be nontaxable.

We disagree. Both Mr. Hodge and Mr. Wolf agree that this award will be taxable to First Nationwide.[19] Mr. Wolf's opinion that First Nationwide could repudiate Mr. Hodge's sworn testimony and then insist that the award is not taxable remains pure speculation. Even Mr. Wolf admitted upon deposition that any such argument by plaintiffs would stand "little likelihood" of success. Furthermore, Mr. Wolf's suggested justification for a non-taxable award—that it would substitute for FDIC assistance that should have been received by First Nationwide—is simply incorrect. *See First Nationwide I*, 48

---

**17.** *See supra* footnote 10 and accompanying text.

**18.** "[T]he Government's retention of ten percent of the [CAL] reimbursement was, of necessity, worth less in the exchange than First Nationwide's share of the deduction itself." *First Nationwide III*, 51 Fed.Cl. at 769. "There was a mutual understanding that First Nationwide's share of the tax benefits was worth more than the Government's share." *Id.* at 770.

**19.** This situation is distinguishable from the gross up claim in *Centex Corp. v. United States*, 55 Fed.Cl. 381 (2003). There, plaintiffs claimed expectancy damages in the amount that Guarini increased their income taxes. We held that, because the judgment compensated plaintiffs for the loss of money not subject to income tax, the award should not be grossed up—it represented income already taxed. Here, however, any restitution award represents income not yet taxed to the plaintiffs.

Fed.Cl. at 257–63 (holding that plaintiffs are not entitled to recover additional FDIC assistance under the Assistance Agreement as a result of Guarini).

### 7. Possible IRS Disallowance

Finally, Mr. Wolf argues that plaintiffs' entire award should be denied. Mr. Wolf theorizes that the IRS, which was examining plaintiffs returns for tax years 1989–1996 at the time of oral argument, might disallow First Nationwide's CAL deductions for 1989 and 1990 without referring to Guarini. If so, plaintiffs would lose nothing because of Guarini.

Mr. Wolf's argument has no support. In *First Nationwide II*, 49 Fed.Cl. at 751 (citing *Centex Corp. v. United States*, 48 Fed.Cl. 625, 632–36 (2001)), we held that these tax deductions were available, pre-Guarini, as a matter of law. It is too late for the government's expert to suggest that we should have held otherwise. Moreover, plaintiffs announced at oral argument that the audit ended in February 2003 and that the IRS committed not to dispute pre-Guarini deductions.

Finally, regarding plaintiffs' motion to strike certain opinions of Mr. Wolf and Mr. Meyer, the court recognizes that the testimony of both sometimes strays from their respective areas of competence and, for Mr. Wolf, sometimes ventures into legal analysis. In view of our ruling, however, it is unnecessary to rule on the motion. The motion to strike is therefore denied as moot.

### CONCLUSION

█ Plaintiffs' motion for summary judgment on damages is granted. Plaintiffs' motion to strike is denied as moot. The clerk is directed to enter judgment for plaintiffs in the amount of $70,018,647. Costs to plaintiffs.