**FIRST NATIONWIDE BANK, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 96–590C.**

United States Court of Federal Claims.

March 8, 2002.

Harry M. Reasoner, Houston, Texas, for plaintiffs. Thomas P. Marinis, Jr., John D. Taurman, John M. Faust, and Gary L. Leshko, of counsel.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the Government. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director. Paul G. Freeborne, Glenn I. Chernigoff, and Jeffrey T. Infelise, of counsel.

## OPINION

BRUGGINK, Judge.

This contract action is one of several *Wins-*

*tar*-related [1] cases pending before the court, all of which arise from the savings and loans crisis of the late 1980s. It is part of a subgroup of cases which also assert a different breach in the form of legislation (hereafter, the "Guarini" legislation) [2] repealing certain tax deductions available to acquirers from the United States of distressed bank assets. We have previously held that the Guarini legislation breached a covenant of good faith and fair dealing implied in the acquisition contract between plaintiffs and the government. *First Nationwide Bank v. United States ("First Nationwide II")*, 49 Fed.Cl. 750 (2001). Currently pending are cross-motions for summary judgment on whether plaintiffs are entitled to restitution of a portion of the benefits flowing to the United States, as well as plaintiffs' motion to strike one of the exhibits to the Government's motion. Oral argument was held February 28, 2002. For the reasons set out below, plaintiffs' motion for summary judgment is granted; the motion to strike is denied as moot; and the Government's cross-motion is denied.

## BACKGROUND [3]

Plaintiffs are First Nationwide Bank, First Gibraltar Holdings, Inc., and MacAndrews & Forbes Holdings, Inc. They entered into an Assistance Agreement (the "Agreement") with the Federal Savings and Loan Insurance Corporation ("FSLIC"), under the terms of which they assumed the assets of five failed Texas financial institutions and received in exchange certain government assistance. One major component of the Agreement dealt with what occurred on the disposition of "covered assets." These were assets of established book value taken over by plaintiffs (hereafter, "First Nationwide"). During the time the assets were being held, FSLIC guaranteed a minimum yield. Upon sale, the difference between the inherited book value and subsequent sales price was reimbursed by FSLIC to First Nationwide. Under the tax laws then in existence, the reimbursement was not treated as income. We also held earlier that a deduction for covered asset losses was available under the Internal Revenue Code ("IRC"), notwithstanding the reimbursement. *First Nationwide Bank v. United States ("First Nationwide I")*, 48 Fed.Cl. 248, 261, 263–64 (2000). Indeed, this fact was used by FSLIC in attracting buyers like First Nationwide and formed a critical assumption behind the precise terms of the Agreement, shaping what the parties referred to as the "tax benefit" items. In *First Nationwide II*, we held that the United States breached an implied covenant of good faith and fair dealing within the Agreement when, using its unique legislative powers, it retroactively reversed the tax deductibility of covered asset losses through enactment of the Guarini legislation. 49 Fed. Cl. at 755.

The negotiations leading to the tax benefit provisions of the Agreement are relevant. In 1988, FSLIC found itself in possession of a number of defunct financial institutions. As part of a much larger effort to satisfy its insurance obligations to depositors without bankrupting its reserves, the agency developed a plan to divest itself of a specific group of problem assets through the "Southwest Plan." FSLIC sought interested purchasers through a Request for Proposals ("RFP"). In the RFP, it advertised the availability of

---

1. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Named after Congressman Guarini, who sponsored the legislation.

3. The factual background is based on the parties' proposed findings of fact. Although the Government declined to admit virtually any of First Nationwide's proposed findings, the court notes that most disputes did not draw into question the court's ability to rely on the documents that were the foundation of most of the findings. The court also took the unusual step of directing First Nationwide to have available for examination

Richard P. Hodge, Executive Vice President of California Federal Bank, formerly known as First Nationwide Bank, who prepared First Nationwide's damage calculation and who submitted an affidavit. *See* RCFC 43(c). The Government objected to his appearance. The court (and Government counsel) examined Mr. Hodge during oral argument. His testimony was helpful in understanding First Nationwide's damage methodology and Government counsel was not able to point to anything in his testimony that prejudiced its ability to defend against First Nationwide's motion for summary judgment, so long as his precise calculations were not considered by the court.

certain tax benefits, including the deduction of losses on covered assets. As we explained in *First Nationwide II*, FSLIC's request for acquisition proposals specifically linked a reduction in what was otherwise anticipated to be necessary cash reimbursements from FSLIC to available tax incentives: " 'The [tax] provisions were intended to aid the FSLIC by reducing the amount of FSLIC assistance that should be required by an acquiring institution . . . by the amount of the tax benefit obtained . . . .' " 49 Fed.Cl. at 751 (quoting the RFP).[4]

The RFP stated that bidders should offer to share tax benefits in one of two ways, either by converting them into a reduction in assistance amounts or by a later division of the actual tax benefits reaped by the bank. First Nationwide and FSLIC agreed on the former. Thus, under section 3(a)(1) of the Agreement, FSLIC reimbursed only the "After–Tax Amount" of covered asset losses incurred by First Nationwide. Rather than determining what First Nationwide's actual tax savings were, the parties agreed on certain assumptions about the effective tax rate, divided the anticipated benefit two to one between First Nationwide and the Government, and then converted that assumption into a ten percent reduction in reimbursements on any particular asset. There can be no question that the parties understood that the unpaid ten percent represented the agency's one-third share of First Nationwide's tax benefits.

There were other items in the Agreement that could generate possible FSLIC reimbursements, such as yield maintenance, which was also subject to a ten percent reduction. As to all assistance, however, FSLIC was guaranteed that the sum of reductions in reimbursements due to tax sharing would amount to at least $30 million annually. This meant that, even if the reductions attributable to tax deductible items did not equal that amount, the full $30 million would nevertheless be credited against future payment obligations. The value of the tax

deductions to First Nationwide, on the other hand, depended in a particular year upon whether, in light of its overall tax position, it could employ the deductions to offset income. As Richard P. Hodge testified during oral argument, however, if First Nationwide had not been able to use the deduction to offset corresponding income in a given year, the unused portion could be carried over as a net operating loss until it was eventually used.

The Agreement set up a complex mechanism of separate bookkeeping accounts to keep track of the amounts payable by or due to FSLIC. One account reflected amounts due from FSLIC, primarily consisting of reimbursement of ninety percent of the difference between the book value and sales price of a covered asset. Credits could be generated under many circumstances, including sale of a different asset at an amount in excess of book value. A different account kept track of First Nationwide's payments toward the $30 million minimum per year. First Nationwide received a credit toward that minimum payment obligation for every dollar of reimbursement payment reductions generated by covered asset loss deductions.

The Guarini legislation specifically targeted and retroactively eliminated only the covered asset loss deduction. Other tax benefits were unaffected. After the breach, First Nationwide could only deduct the ten percent unreimbursed portion of covered asset losses. Mr. Hodge claims that the amount of covered asset losses rendered non-deductible by the Guarini legislation was $668,026,051. He calculates that the amount of assistance lost after Guarini due to the ten percent reduction in covered asset loss reimbursement is $74,225,116.

The mechanics of the Agreement were also unaffected after the repeal of the covered asset loss deductions. Thus, FSLIC and the Federal Deposit Insurance Corporation ("FDIC"), successor to FSLIC, continued to make assistance payments, including reimbursement for covered asset losses. Over

---

**4.** The Government persists in characterizing these potential tax deductions as belonging to the agency; that they were the agency's to share. This is incorrect. While it is true that the tax provisions were adopted and renewed in order to benefit FSLIC by giving it something of value to offer acquirers (at the expense of the Treasury), the deductions could only be claimed by a taxpayer, such as First Nationwide.

$1.3 billion was received after the effective date of the Guarini legislation. FSLIC, however, continued to apply the ten percent reduction to all reimbursements, including those prompted by losses on dispositions of covered assets. For its part, First Nationwide also retained responsibilities with respect to the failed institutions it acquired. FSLIC had previously estimated that it would cost the agency over $6.8 billion to liquidate these banks.

## DISCUSSION

The Government contends that the proper approach to recompensing the breach here is through expectancy damages. First Nationwide, on the other hand, prefers to claim partial restitution. Doing so has the obvious advantage here in that restitution would make use of calculations from fixed events in the past, whereas an expectancy calculation in this instance would involve creating hypothetical tax returns for previous years in light of events that did not occur. As Mr. Hodge explained, an expectancy calculation becomes particularly problematic in the present case, when deductions would have to be carried over to future years and, as counsel explained, would have to take into effect changes in corporate ownership over time. First Nationwide does not have to claim expectancy damages, in any event. It can waive them and proceed on a restitution theory.

The obvious problem with restitution however, is that, as explained below, it typically requires unwinding the entire transaction. What First Nationwide seeks is to disgorge only the ten percent restitution reductions attributable to covered asset losses. The fundamental question framed by the cross-motions is whether an exception to total restitution is appropriate here.

 Restitution is not, strictly speaking, a damages remedy. The real purpose of restitution is to put the parties back into their respective pre-contract circumstances. In

*Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001), for example, the Federal Circuit stated that "[t]he idea behind restitution is ... to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *See also, In re First Penn Corp.*, 793 F.2d 270, 272 (10th Cir.1986) ("The object of restitution is to return the parties to the position that existed before the transaction occurred"); *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 384 cmt. a (1981) ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party. The objective is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract").[5]

The *Glendale* court went on to describe the typical restitution model:

> Restitution is sometimes described in terms of taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party. That requires determining what benefit from the contract the breaching party has received, and restoring that to the nonbreaching party. This approach makes good sense when viewed, for example, from the perspective of a typical contract for the sale of goods. B contracts to buy 1000 widgets from S, for $10 a widget. B gives S $1000 down, the balance of $9000 to be paid on delivery. S defaults on the contract; B sues for restitution. B gets his $1000 back. The amount that S is wrongfully benefitted by the contract is taken from S, and restored to B.

239 F.3d at 1380–81 (citation omitted).

As the Government points out, restitution for breach by the other party fits best when the breaching party wholly fails to perform and when the injured party has paid up front for that non-performance. The Restatement of Contracts captures this scenario:

---

5. A principle measure of relief in restitution is "the value of the benefits received by the defendant due to the plaintiff's performance." *Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1372 (Fed.Cir.2001); *see also LaSalle Talman*

*Bank, F.S.B. v. United States*, 45 Fed.Cl. 64, 116 (1999) (noting that the "traditional measure of restitution" is the "benefit conferred on the breaching party or by the market value of the goods or services rendered").

[O]n a breach by non-performance that gives rise to a claim for damages for total breach or on a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.

(2) The injured party has no right to restitution if he has performed all of his duties under the contract and no performance by the other party remains due other than payment of a definite sum of money for that performance.

RESTATEMENT (SECOND) OF CONTRACTS § 373 (1981). *See also*, Andrew Kull, *Disgorgement for Breach, the "Restitution Interest," and the Restatement of Contracts*, 79 TEX. L. REV. 2021, 2032 n. 26 (2001) ("The standard and uncontroversial instances of restitution for breach are typically cases where a plaintiff seeks specific restitution, or seeks to recover money paid in advance for a performance that the defendant altogether fails to render"). As appears from the proviso in paragraph (2), restitution is not available when payment is all that remains.

The Supreme Court's recent opinion in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), provides an illustration. In *Mobil*, plaintiffs paid the Government $156 million for leases granting them petroleum exploration and development rights. 530 U.S. at 607, 120 S.Ct. 2423. The Government subsequently repudiated. *Id.* The Supreme Court held that if the Government

said it would break, or did break, an important contractual promise, thereby "substantially impair[ing] the value of the contract[s]" to the companies, ... then ... [it] must give the companies their money back. And it must do so whether the contracts would, or would not, ultimately have proved financially beneficial to the companies.

*Id.* at 608, 120 S.Ct. 2423 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 243 and citing § 373 cmt. a, illus. 1). In sum, restitution typically involves a return of all payments to the injured party. First Na-

tionwide does not even suggest that is possible in the present case.

There is very little law in this circuit on whether restitution can also be employed to return only some part of the consideration received. For that reason, although it is not directly on point, both parties seek guidance from the Federal Circuit's decision in *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548 (Fed.Cir.1992). That case does indeed deal with the question of severability of a contract. The question was whether the refusal of the Forest Service to allow access to four of fourteen timber tracts negated the contractor's obligation to proceed with the rest of the contract. The court held that it did, in part because the contract was not divisible:

The consequence of, and remedy for, breach of a contract depends in part upon whether the contract was divisible. If only a severable portion of a contract was breached, the non-breaching party can recover damages for that portion of the contract but its remaining contractual duties are not discharged. However, if a contract is not clearly divisible, in accordance with the intention of the parties, the breaching party can not require the non-breaching party to continue to perform what is left of the contract.

There is a presumption that when parties enter into a contract, each and every term and condition is in consideration of all the others, unless otherwise stated.

*Id.* at 1552 (citations omitted). The court ordered the return of the contractor's advance deposits. It grounded its ultimate holding, however, in the particular circumstances: "[w]ithout clear support in the contract document and in the intent of the parties, a contract that is written as a unitary package shall not be severed into parts *in order to favor the breaching party*." *Id.* at 1553 (emphasis added); *see also In re Marshall's Garage*, 63 F.2d 759, 762 (2nd Cir. 1933); *Czarnikow–Rionda Co. v. West Mkt. Grocery Co.*, 21 F.2d 309 (2nd Cir.1927); *Monarch Photo, Inc. v. Qualex, Inc.*, 935 F.Supp. 1028, 1032 (D.N.D.1996). Although First Nationwide is not the breaching party here, we recognize the general principle from

*Stone Forest* that partially performed contracts should normally not be divided into component parts when restitution is sought.

The Government also argues that First Nationwide waived its right to restitution, citing *Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306 (1976). In that case, the Court of Claims held that, when confronted with a material breach of contract, an injured party may (1) cancel the contract, relieving both parties of further obligations and entitling the injured party to "damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed);" or (2) continue the contract, which would keep the obligations of both parties intact and permit the injured party to retain "only a claim for damages for partial breach." *Id.* at 1313. If the injured party chooses to continue the contract, its "acceptance of performance under [the] once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create." *Mobil*, 530 U.S. at 622, 120 S.Ct. 2423 (citing § 373 cmt. a; RESTATEMENT OF RESTITUTION § 68 cmt. b (1936)); *see also LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed.Cl. 64, 120 n. 94 (noting that "Plaintiff continues [after defendant's breach of contract] to operate some of the branches acquired from the 1982 mergers. It has not offered to give up these branches. That fact alone mitigates against any award of restitution"). In other words, the Government argues, a party faced with a breach of contract may not claim partial restitution by proceeding with the remaining favorable aspects of the contract and seeking restitution for the breached aspects.

These principles make sense when a party seeks full restitution, as the plaintiff in *LaSalle Talman* did, or when the claimant has a meaningful choice about performing with respect to other portions of the agreement. The proper remedy when one party fully performs is that it should receive full payment from the other party. Unscrambling the performances is pointless. On a smaller scale, if a party fails to perform a divisible portion of a contract, the non-breaching party should, if it has any choice about going forward, be put to the choice of either declaring a material breach, or continuing its own performance and attempting to prove damages.

Neither circumstance applies here. After Guarini, the only thing missing from the operation of the Agreement was the tax deduction. If a sale generated a loss, it still resulted in reimbursement, and the reimbursement was still discounted ten percent as a reflection of a nonexistent tax deduction. Even though First Nationwide fully performed, the Government could no longer "pay the contract price." The change in the law intervened. Nor could First Nationwide have disengaged from the tax sharing provisions of the Agreement. The mechanism for reimbursement was already in place and automatically applied to each covered asset loss reimbursement payment. Simply choosing not to sell assets would not have been a realistic alternative.[6]

In addition, the Government argues that it received nothing from First Nationwide that it could disgorge. First Nationwide, in other words, did not make any down payments. The ten percent reductions were never actually transferred from First Nationwide. This argument is sophistical, however. Reducing the amount of reimbursement had the direct effect of leaving money in the Government's hands that otherwise would have been paid out. Certain events or consequences were triggered upon the sale of a covered asset. The first was that if an asset was sold for less than book value, FSLIC had an obligation to reimburse the difference. But the taxpayer also became entitled by law to claim an offset against income in the total amount of that difference. Because the parties understood that second phenomenon, they negotiated a third phenomenon—an automatic reduction by ten percent of the reimbursement amount. The reduction in reimbursement was thus joined at the hip to the

---

6. This is consistent with our observation in *LaSalle Talman* that restitution is generally a poor fit for FIRREA claims. The plaintiff in *LaSalle Talman* sought restitution of the total net cost of performing under the contract, offset by all the benefits it received from the Government prior to the breach. 45 Fed.Cl. at 112–13.

tax deduction. Only if there was a sale producing a loss would there be a tax deduction to First Nationwide, a government reimbursement obligation, and a credit in the amount of ten percent of the loss against FSLIC's reimbursement obligation.

As Professor Palmer explains, the central aim of restitution for a defendant's breach is "to recover benefits transferred by the plaintiff in performance of the contract. Sometimes restitution will be in specie and sometimes in the amount of money payments made by the plaintiff, but in a high percentage of the cases it will be for the money value of his performance." GEORGE E. PALMER, THE LAW OF RESTITUTION § 4.2 (1978). He goes on to say that the word " 'benefit' is not an entirely happy choice, since it tends to suggest that there must have been some addition to the defendant's wealth ... But it is not the conception of benefit that has been used when restitution is based upon the defendant's breach." *Id.* Instead, in those situations, benefit consists of "a rendition of part or all of the bargained-for performance ... 'benefit' does not have a single meaning." *Id.*[7]

To apply that analysis here, we begin with the plain facts: the parties negotiated to convert one-third of the anticipated tax savings into a reduction of reimbursements; those reductions had cash value to the Government; after Guarini, First Nationwide could not take the covered asset loss deduction; the Government nevertheless kept reducing its reimbursements, thereby retaining the cash value of its one-third share of tax benefits that no longer existed. First Nationwide, in short, rendered its performance and the Government received the benefit of that performance. It is thus totally inaccurate to argue that the United States has nothing in its possession that originated with First Nationwide, or that it would be unfair to question its right to retain its share of

non-existent tax benefits.[8] We agree with First Nationwide that the ten percent reductions in reimbursement are fair game in a restitution analysis.

Nor is the claim of partial restitution inconsistent with our prior rulings. According to the Government, what First Nationwide really seeks is reformation of the contract retrospectively to increase the amount of reimbursement from ninety percent to one-hundred percent of the covered asset losses. It relies on language from *First Nationwide I*, 48 Fed.Cl. at 264:

> In § 6(a)(2) of the Assistance Agreement, the FSLIC explicitly promised to make reimbursement payments to plaintiffs for covered asset losses. The FSLIC undertook a duty to make payments to plaintiffs, not *vice versa.* Plaintiffs' new theory does not correspond to the reality of the Assistance Agreement. Instead, it reflects an effort to avoid alleging that the FDIC is in breach. The effort fails, however. In the absence of a promise by plaintiffs to make tax benefit payments, there is no duty to which plaintiffs' proposed condition, enactment of the Guarini legislation, can attach. Once the parties put in place the contractual formula for reimbursement, there was nothing further for plaintiffs to do or not do.

This excerpt from the prior opinion is not on point. It addresses First Nationwide's alternative liability theory that there was an implied promise to guarantee one-hundred percent reimbursement in the event the tax deduction did not materialize. We rejected that theory, concluding instead that the promise was that the Government would not interfere with First Nationwide's reasonable expectations to receive the full benefits of the contract, which included the right under law to deductions for covered asset losses. Having found a breach of that promise, the ques-

---

7. A "benefit conferred" is anything the breaching party bargained for and received. *Castle v. United States*, 48 Fed.Cl. 187, 216 (2000) (citing RESTATEMENT (SECOND) OF CONTRACTS § 370 cmt. a). The benefit may result "from the transfer of property or from ... forbearance." § 370 cmt. a (citing RESTATEMENT OF RESTITUTION § 1 cmt. b).

8. For example, a "Tax Profile" of the First Gibraltar transaction, prepared March 12, 1991, by the FDIC tax accountant responsible for administering the contract, described the ten percent reductions applied to after-tax reimbursements as allowing FSLIC "to retain a 10% up-front payment for tax benefits."

tion of whether restitution makes sense is not foreclosed.

Having considered peripheral issues, the real question remains: What is the proper remedy under these unique circumstances? Is it appropriate as a matter of fact and law to isolate the tax benefit provisions for restitutionary treatment? We note at the offset that the Government is correct that both parties were using multiple negotiating "chips" in developing the Agreement. Tax benefits were only one part of total consideration, and covered asset losses were only one type of tax benefit. Restitution, on the other hand, as explained above, normally involves putting both parties back into their pre-contract posture. To do that here, of course, First Nationwide would have to offer proof of the net difference in value between everything it received and everything the Government received. In addition, it would have to return all those benefits.[9] Because neither party seriously contemplates actually attempting to unscramble this transaction, the Government concludes that restitution is per se unavailable.

■ We disagree. While restitution against a breaching party is normally available only when that party is in total breach and the non-breaching party has paid money up front, it can also be awarded when the contract is meaningfully divisible. As Palmer writes in his Law of Restitution:

> [T]here are situations in which a fair solution requires partial rescission or equivalent relief, and a failure to recognize this can result in manifest injustice....
>
> ....
>
> Rescission of an entire contract is a process of reopening the whole transaction; there are times when this is not a sensible thing to do, because a more limited form of relief can be formulated to fit the needs of the case at hand. Courts have not hesitated to give such relief even though it amounts to partial rescission.

PALMER, *supra*, at § 12.6(d).

■ This case presents one of those circumstances. As with other *Winstar* cases,

the circumstances are, in some ways, sui generis. It is impossible to ignore the fact that the Government appears as both a contracting party and as a sovereign entity with powers to legislate and regulate. This gives it unique defenses and rules out certain types of remedies. For example, while we believe that it is possible for the Government to be held accountable for breach of a contract, even when legislating, it cannot be ignored that a typical restitution remedy makes no sense here. Banks cannot simply walk away from obligations to depositors. Tax returns cannot be reconfigured without IRS oversight. In short, we believe that the traditional presumption against considering partial restitution should not weigh heavily.

Is it appropriate to bracket the provisions of the Agreement dealing with tax benefits when considering restitution? We find that it is for several reasons. First, because the Government's breach was narrow, it had no spill-over consequences on other aspects of contract administration. They proceeded without interruption. More importantly, the parties' negotiations convince the court that the Government's retention of ten percent of the covered asset loss reimbursement was, of necessity, worth less in the exchange than First Nationwide's share of the deduction itself. Forcing the Government to disgorge the retained amounts, in other words, so long as First Nationwide waives any other damages flowing from the breach, does not undercut the basis of the Agreement and cannot prejudice the Government. The parties in effect pre-priced the cost of this isolated breach at something in excess of the amount retained by FSLIC. For example, a FSLIC memorandum written on December 29, 1988, the day after the Agreement was signed, recites that the calculation of "the tax effected assistance to FSLIC was ... the basis that the bid cost was presented to the Board." The agency then calculated that the cost of the Agreement to the Treasury was in the range of $1.5 to $1.8 billion, of which over $300 million was attributable to covered asset

---

9. "[U]nder an entire contract courts usually will not permit partial rescission...." PALMER, *supra*, at § 4.6.

loss deductions. It then compared that cost to the benefits the agency could anticipate beyond the minimum guarantee. It concluded that the "amount of FSLIC tax savings would be $400 million." The assumption was made that "the guarantee amount is undoubtedly [ ] lower than expected savings." First Nationwide's own documents reflect a similar assumption.

Although the final agreement represented a unified "package" of various types of consideration and benefits, the record is clear that the ten percent reduction in reimbursements for covered asset losses was a direct result of the parties' agreement to divide First Nationwide's anticipated tax benefits. First Nationwide retained two-thirds of the anticipated benefits; FSLIC got one-third, in the form of the reduction in reimbursements (plus the assurance that all of the reimbursement reductions were guaranteed to be no less than $30 million per year). This was the result of negotiations separately focused on tax benefits and resulting in separate provisions of the Agreement.

Finally, it is also noteworthy that the tax benefits were incrementally linked to particular assets. In other words, the covered asset loss, its corresponding reimbursement, and the deduction were all triggered, pre-Guarini, by the sale of an asset. These phenomena did not exist independently of each other. They bore a fixed relationship to each other and operated independently of other tax deductions. The parties accrued their respective benefits one asset at a time. In this respect, the contract, insofar as reimbursement, tax benefits, and tax sharing were concerned, operated independently of the rest of the Agreement, and consisted of a series of separate transactions.

In sum, it is clear that FSLIC's decision to accept First Nationwide's proposal was based on a full understanding of the cost to the Treasury of First Nationwide's tax benefits, netted out against one-third of those benefits being retained by the agency. There was a mutual understanding that First Nationwide's share of the tax benefits was worth more than the Government's share. Forcing the return of the unearned reimbursement

reductions thus cannot be unfair to the Government.

### The Measure of First Nationwide's Restitution Recovery

First Nationwide asserts that the measure of its restitution recovery is $74,225,116. Mr. Hodge reached this figure through a four-step process, using data from Special Reserve Account ("SRA") Reports submitted to and audited by the Government. The Government does not fully respond to First Nationwide's proposed measure of damages. Instead, it requests that, to the extent its motion for summary judgment is denied, it be permitted additional discovery, pursuant to RCFC 56(g), to respond to First Nationwide's motion for summary judgment. The Government requests discovery to two ends: (1) to determine the amount of the proper offset against First Nationwide's restitutionary award and the amount necessary to return the parties to their status quo ante; and (2) to assess the accuracy of the calculations set forth in Mr. Hodge's declaration. We agree that discovery is appropriate along these lines.

## CONCLUSION

First Nationwide's motion for summary judgment is granted. Plaintiffs are entitled to claim restitution of the value of the unearned reimbursement reductions. Plaintiffs' motion to strike is denied as moot.[10] The Government's motion for summary judgment is denied. Discovery remains open for the limited purpose of addressing First Nationwide's calculations. The parties are directed to consult and attempt to agree on a schedule for completion of discovery and report their views in a status report to be filed on or before March 26, 2002.

---

10. We agree with plaintiffs, however, that the editorial is inadmissible hearsay.