# United States Court of Appeals for the Federal Circuit

03-5128

FIRST NATIONWIDE BANK, FIRST GIBRALTER HOLDINGS, INC.,
and MACANDREWS & FORBES HOLDINGS, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,

Harry M. Reasoner, Vinson & Elkins L.L.P., of Houston, Texas, argued for plaintiffs-appellees. With him on the brief was Thomas P. Marinis, Jr. Of counsel on the brief were John D. Taurman and John M. Faust, of Washington DC. Of counsel was Gary L. Leshko, Cozen O'Connor, of New York, New York.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, Jeanne E. Davidson, Deputy Director, and Scott D. Austin, Trial Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge Eric G. Bruggink

# United States Court of Appeals for the Federal Circuit

03-5128


FIRST NATIONWIDE BANK, FIRST GIBRALTER HOLDINGS, INC.,
and MACANDREWS & FORBES HOLDINGS, INC.,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant,


_____

DECIDED:  December 13, 2005
_____


Before MICHEL, Chief Judge, NEWMAN and LOURIE, Circuit Judges.

NEWMAN, Circuit Judge.


This case arose from the savings and loan crisis of the 1980s and the ensuing regulatory regime, as summarized in United States v. Winstar Corp., 518 U.S. 839 (1996). The United States Court of Federal Claims ruled that the government, in enacting and implementing the 1993 Guarini Amendment to the Internal Revenue Code, breached its contractual obligations to the First Nationwide Bank, and awarded damages. First Nationwide Bank v. United States, 48 Fed. Cl. 248 (2000) (Nationwide I); 49 Fed. Cl. 750

(2001) (<u>Nationwide II</u>); 51 Fed. Cl. 763 (2002) (<u>Nationwide III</u>); 56 Fed. Cl. 438 (2003) (<u>Nationwide IV</u>). The judgment is affirmed.

BACKGROUND

In response to the large number of failing savings and loan institutions in the economic conditions of the 1980s, the United States, acting through the Federal Savings and Loan Insurance Corporation (FSLIC) and related regulatory bodies, encouraged solvent banks to infuse capital and management resources into failing thrift institutions. The government offered various incentives for that purpose, including tax and accounting benefits, regulatory relief and forbearances, and cash payments, as discussed in <u>Winstar</u>, 518 U.S. at 847-56.

In accordance with a plan called the "Southwest Plan," the FSLIC sought a buyer for five failing savings and loan institutions: First Texas Savings Association, Gibraltar Savings Association, Killeen Savings and Loan Association, Montfort Savings Association, and Home Savings Association. These five institutions had total liabilities of over twelve billion dollars. On December 28, 1988 First Nationwide Bank and associated investors (collectively "Nationwide") agreed to acquire the assets and liabilities of the five failing institutions, and also to provide $315 million in cash; the terms and conditions were set forth in an Assistance Agreement between Nationwide and the FSLIC.

The Assistance Agreement provided, *inter alia*, that in addition to the tax deductions available for losses, FSLIC would provide tax-exempt reimbursement of 90% of each covered asset that was liquidated at a loss. The Court of Federal Claims explained that Nationwide and the government "negotiated to convert one-third of the anticipated tax savings into a reduction in reimbursements," <u>Nationwide III</u>, 51 Fed. Cl. at 768, in that the

10% reduction in loss reimbursement was one-third of the 30% tax rate set in the Assistance Agreement. Id. at 764.

The transfer to Nationwide of the five Southwest Plan thrift institutions was completed in December 1988. In August 1989 enactment of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) eliminated many of the incentives that had been employed by the FSLIC to salvage failing thrifts, and required the newly formed Resolution Trust Corporation (RTC) to evaluate all existing agreements with respect to loss reimbursement, tax consequences, and other concessions and considerations. 12 U.S.C. §1441a(b)(10)(B) (1989). Upon such evaluation the RTC and other cognizant agencies proposed no change in the arrangement with Nationwide, and the Assistance Agreement continued in effect in accordance with its terms.

In 1993, in response to concerns that the various assistance agreements granting tax benefits for covered asset losses had created an incentive to maximize losses, Congress enacted a remedial provision as part of the Omnibus Budget Reconciliation Act of 1993 (OBRA). Section 13224 of the OBRA, known as the "Guarini Legislation," disallowed tax deductions for savings and loan losses that were reimbursed with tax-exempt FSLIC assistance; this disallowance was made retroactive to years ending on or after March 4, 1991. Pub. L. No. 103-66, 107 Stat. 485 (1993), 26 U.S.C. §165 note. The effect was to eliminate a substantial benefit provided by the Assistance Agreement. Nationwide (and others) filed suit against the FDIC, as successor to the FSLIC.

In August 1996 Nationwide and the FDIC entered into a Settlement and Termination Agreement (the "Termination Agreement"), terminating both the Assistance Agreement and

03-5128                                    3

the suit against FDIC.  FDIC made certain payments to Nationwide, and the Termination

Agreement released the FDIC from further liability:

> **12.2.  Release by First Nationwide and the Acquirers.**  First Nationwide and the Acquirers each hereby release, hold harmless, acquit, and forever discharge the FDIC Manager [a term used for the FDIC in its capacity as Manager of the FRF (the FSLIC Resolution Fund)] and the FDIC in all its capacities other than as Manager of the FRF, and their respective present and former parents, subsidiaries and affiliates, and the respective present and former officers, directors, successors, assigns, employees, agents, and representatives of all the foregoing (collectively, the "FDIC Released Persons") from and against any and all actions and causes of actions, suits, disputes, debts, accounts, promises, warranties, damages, claims, proceedings, demands and liabilities, of every kind and character, direct and indirect, known and unknown, at law or in equity, that First Nationwide and the Acquirers now have, have had at any time heretofore, or hereafter may have against the FDIC Released Persons by reason of any act or omission whatsoever by any FDIC Released Persons in connection with the Lawsuit, the Assistance Agreement, the supervision of the FDIC Released Persons with respect to the Covered Assets, Related Claims or any other matters governed by the Assistance Agreement, GLOS, the Acquisition Agreements, the ACSI Settlement, the Excess Proceeds Agreement, or any other agreements related thereto; <u>provided</u>, <u>however</u>, that the release provided in this Section 12.1 [sic] shall not limit the rights of First Nationwide and the Acquirers to bring any claim based on fraud, willful misrepresentation of a material fact, willful failure to disclose a material fact, or willful misconduct.

Section 4.2 of the Termination Agreement excepted all claims against the United States by

reason of the Guarini Legislation, while preserving the release of the FDIC and the RTC:

> **4.2.  Excepted Claims.**  Excepted entirely from this Agreement (and hereinafter referred to as the "Excepted Claims") are any and all actions and causes of action, suits, disputes, debts, accounts, promises, warranties, damages, claims, proceedings, demands, and liabilities, of every kind and character, direct and indirect, known and unknown, at law or in equity, that First Nationwide or the acquirers now have, have had at any time heretofore, or hereafter may have against the United States of America for breach of contract or constitutional taking by reason of the enactment of Section 13224 of the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66 (the "Guarini Legislation").  It is the intention of the parties hereto that all claims and counterclaims asserted in the Lawsuit be dismissed with prejudice, except that such dismissal shall expressly preserve the rights, if any, of First Nationwide and the Acquirers **to assert the Excepted Claims solely**

**against the United States of America in the United States Court of Federal Claims**. The Excepted Claims shall not be based on any acts or omissions of the FDIC in any capacity or the Resolution Trust Corporation ("RTC"), and shall not be asserted against the FDIC in any capacity or the RTC as a named defendant in any forum at any time in the future. Nothing contained in this Agreement shall, or shall be deemed to, constitute an admission of any allegation in the Lawsuit, or waive or relinquish any defenses that the United States of America may have to the Excepted Claims preserved by this Section 4.2. [Emphasis added.]

Nationwide, invoking Section 4.2, filed suit in the Court of Federal Claims in September 1996, seeking damages for breach of contract or unconstitutional taking arising from the Guarini Legislation. Responding to the government's motion for partial summary judgment, the court held in Nationwide I that Section 4.2 preserved this claim against the United States. 48 Fed. Cl. at 258. In further proceedings the court held that the government, as contracting party to the Assistance Agreement, breached the implied covenant of good faith and fair dealing with enactment of the abrogating Guarini Legislation, Nationwide II, 49 Fed. Cl. at 755, and that Nationwide is entitled to recover damages for that breach. Nationwide III, 51 Fed. Cl. at 769. Upon further hearing, the court awarded $70,018,647 in damages. Nationwide IV, 56 Fed. Cl. at 449. The United States challenges all of these rulings. The United States also asks this court to review and decline to follow our precedential decision, on similar facts, in Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005).

DISCUSSION

**A**

In <u>Nationwide I</u> the Court of Federal Claims held that the release provision in the Termination Agreement does not bar Nationwide from pressing this claim against the United States. The government argues that Section 12.2 of the Termination Agreement released the FDIC from all liability under the Assistance Agreement, and that since the FDIC was the government's party to the Termination Agreement in its capacity as successor to FSLIC, the release of the FDIC also released the United States from all liability for breach. Thus the government argues that the Excepted Claim provision, Section 4.2, did not preserve a breach claim against the United States. The government also argues that any judgment against the United States would be satisfied from the FSLIC Resolution Fund (FRF) which is managed by FDIC and, because of the release of FDIC in Section 12.2, the FRF cannot be called upon to satisfy any judgment against the United States under Section 4.2. Thus the government argues that since Nationwide agreed not to sue the FDIC, it cannot sue the United States despite the express reservation of this right.

This question arose in <u>Centex</u> and was decided by the Court of Federal Claims in the same way as in <u>Nationwide I</u>, and affirmed by the Federal Circuit. In <u>Centex</u> the plaintiff bank had entered into a termination agreement with the FDIC as successor to the FSLIC, terminating an assistance agreement that contained tax benefits expunged by the Guarini Legislation. The <u>Centex</u> termination agreement released the FDIC from claims related to the assistance agreement, but reserved to the bank the right to bring a claim against the United States "based on legislation that resulted in the reduction or elimination of

contractual benefits" of the FSLIC-assisted acquisition of failing thrifts. The bank then sued the United States, alleging that the Guarini Legislation constituted a breach of contract and incurred liability for damages. On the government's argument that the reservation of the right to sue the United States was ineffective, this court on appeal held:

> The agreement barred an action directly against the FDIC, but to the extent that an action against the United States is considered to implicate the FDIC, such as by requiring that any judgment be paid from the FRF, the reservation of the right to sue the United States in the Termination Agreement must be interpreted to permit such an action.

Centex, 395 F.3d at 1313. The government now asks this court to decline to follow Centex and to disregard or hold ineffective Section 4.2 in the Termination Agreement.

In Nationwide I, which was decided before the Federal Circuit reached Centex on appeal, the Court of Federal Claims held that this contract claim against the United States was preserved by Section 4.2. The court also held that it is not controlling whether the FDIC manages the fund from which damages may be paid, for the claim for breach by reason of the Guarini Legislation was expressly excepted by Section 4.2. We agree that the Court of Federal Claims correctly construed the Termination Agreement. The principle that a contract is construed to give effect to all of its provisions does not exempt contracts with the United States. See Tecon Corp. v. United States, 411 F.2d 1262, 1264 (Ct. Cl. 1969) ("A construction of a contract provision which gives meaning to all its language is to be favored."); Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979 (Ct. Cl. 1965) ("Also, an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous"). The government's proposed interpretation would materially change the bargain by eliminating a remedy that had been expressly

reserved. The Court of Federal Claims correctly held that the Termination Agreement cannot be interpreted as eliminating Section 4.2 while preserving Section 12.2, for such an interpretation would deprive a material contract provision of effect.

The Centex court also heard the argument that since damages for breach of contract would be paid from a fund of which FDIC is the manager, the release of the FDIC means that the United States could not pay any damages if such were awarded, and thus the United States cannot be liable for damages. In Centex the court explained that the asserted source of funds neither insulated the United States from liability, nor freed it from the obligation to pay damages if such were incurred. We agree that the Termination Agreement, which preserved Nationwide's claims against the United States, did not in Section 12.2 place the FDIC in the position of preventing payment of a judgment against the United States. The holdings of Nationwide I are affirmed.

**B**

The government also argues that the Guarini Legislation could not incur governmental liability for breach of contract with respect to elimination of tax incentives that were included in the Assistance Agreement with Nationwide, because the Tax Code did not authorize these tax incentives. The government argues that Nationwide was never entitled to the tax benefits that it received in the Assistance Agreement, and thus suffered no deprivation by the Guarini Legislation. The argument appears to be that this aspect of the Assistance Agreement was contrary to law and that the Guarini Legislation simply eliminated the illegality. This argument had been made in Centex, and the Federal Circuit affirmed the comparable holding of the Court of Federal Claims. 395 F.3d at 1304.

Various statutes were enacted to facilitate government intervention when the savings and loan institutions began to fail in large numbers. The Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172, codified at 26 U.S.C. §597, was the foundation of several tax incentives, including authorization to the FSLIC to grant tax benefits in consideration for investment in and acquisition of weak or insolvent thrift institutions. See Centex, 395 F.3d at 1292. For example, the Internal Revenue Code at 26 U.S.C. §597(a) provided that assistance payments to acquiring institutions in FSLIC-assisted transactions would not be taxed as income to the acquiring institutions, and 26 U.S.C. §597(b) provided that such assistance payments would not reduce the basis of the acquired assets for tax purposes. Although the government argues that these provisions did not override other provisions of the tax code, specifically 26 U.S.C. §§165, 166, and 1001, which the government states are in conflict with §597, that is not a tenable argument.

The favorable tax treatment was enacted as an incentive to facilitate the acquisition of failing thrifts, by providing benefits to the acquiring and merged financial institutions. Indeed, §597 of the Internal Revenue Code was directed explicitly to the tax treatment of such acquisitions. As a principle of statutory interpretation, a specific provision prevails against broader or more general provisions, absent clear contrary intent. See Radznower v. Touche Ross & Co., 426 U.S. 148, 153 (1976) (specific statute not vitiated by general statute absent manifest intent); Morton v. Mancari, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.") This court ruled in Centex, 395 F.3d at 1295, that §597 was enacted as a tax incentive to attract solvent financial institutions to

invest in and manage failing thrifts, and in this application superseded the general provisions of §§165 and 166.

Similarly, the general principle of 26 U.S.C. §1001(a) was overtaken by §597. Section 1001(a) concerns deduction of losses from disposition of property, measuring such loss as "the excess of the adjusted basis provided in such section [1011] for determining loss over the amount realized." The government argues that FSLIC reimbursement of losses on thrift property should always have been included in the "amount realized," and should not have been treated in the way that was authorized in the Assistance Agreement. However, Code §597 explicitly authorized these tax incentives to FSLIC-assisted thrift acquisitions, until abrogated by the Guarini Legislation. This court explained in Centex:

> After a close examination of the series of statutory provisions enacted in the 1980s and early 1990s that specifically addressed FSLIC-assisted acquisitions, we agree with the trial court that, prior to the enactment of the Guarini amendment in 1993, Congress allowed built-in losses to be deducted even though they were offset by FSLIC assistance payments.

395 F.3d at 1295.

Nationwide entered into the Assistance Agreement on the premise and promise of the tax benefits that were included in the Agreement. Section 597 of the Internal Revenue Code permitted the tax incentives that were implemented by the FSLIC, and were recognized until abrogated by the Guarini Legislation. The government cannot reasonably take a contrary position years after entry into the performance it solicited and authorized. The Court of Federal Claims correctly held in Nationwide II that the tax provisions of the Assistance Agreement were in accordance with law, and that the provisions were abrogated by the Guarini Legislation.

**C**

It is undisputed that the Guarini Legislation deprived Nationwide of a significant aspect of the consideration set forth in the Assistance Agreement. The Court of Federal Claims held that this statutory deprivation constituted a breach of the implied covenant of good faith and fair dealing. This covenant reflects the duty that each party owes to its contracting partners. As Professor Williston explained, such a covenant underlies every contract:

> The underlying principle is that there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract....

5 Williston on Contracts §670 (3d ed. 1961). This court elaborated in Centex that:

> The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

395 F.3d at 1304. The United States, when it enters into contracts, is subject to this covenant. See Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1330 (Fed. Cir. 2003) (the United States is bound by the covenant of good faith and fair dealing); Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 607-08 (2000) (the United States is bound by the same principles of contract law as in contracts between private persons).

The Court of Federal Claims recognized that the added tax benefits were a significant part of the consideration to Nationwide in entering this arrangement to salvage the five failing thrift institutions of the Southwest Plan. The Resolution Trust Corporation had reported, at the inception of the FIRREA: "Assistance payments by FSLIC are not considered taxable to the acquirer. This indirect assistance is significant to acquirers with other profitable lines of business." See Report to the Oversight Board of the Resolution Trust Corporation and the Congress on the 1988/89 Federal Savings and Loan Insurance Corporation Assistance Agreements at 6 (Sept. 18, 1990) (reprinted in Hearing before the Committee on Banking, Housing, and Urban Affairs United States Senate, S. Hrg. 101-113 (Sept. 20, 1990)). It is not disputed that the Guarini Legislation deprived acquiring banks such as Nationwide of a substantial benefit, upon imposing the tax liability that had been eliminated by the Assistance Agreement.

The government presents three principal arguments as to why the Court of Federal Claims erred in finding the government liable for breach: first, that the Assistance Agreement contained no express or implied covenant to preserve the tax benefits, and therefore no covenant was breached; second, that even if there were an implied covenant, Congress was not bound by that covenant; and third, that the Court of Federal Claims erred in declining to apply the doctrine of unmistakability.

**1.**

The government argues that its only contractual obligation concerning covered asset losses was its promise to pay 90% reimbursement of such losses and that it had no obligation to preserve the tax treatment of such reimbursement, despite the tax terms of the Assistance Agreement. The government states that since it had no obligation as to future

tax treatment, it cannot be charged with violation of a covenant when the Guarini Legislation eliminated the favorable tax treatment. If the government's position is that the promised tax benefits in the Assistance Agreement were not part of the contractual bargain, that position is contrary to the Agreement itself. The Assistance Agreement by its terms would have expired in 1998 and contained no suggestion that the tax benefits could end while the other contract obligations would continue.

The covenant of good faith and fair dealing requires a party to respect and implement the contract in accordance with its terms; removal of this material tax benefit was reasonably held by the Court of Federal Claims to violate this covenant. The Guarini Legislation changed the balance of contract consideration, whereby the unilateral removal of this tax benefit was reasonably found to have violated the covenant. Cf. Freedom NY, 329 F.3d at 1330 (government breached express terms of the contract or implied covenant of good faith and fair dealing by withholding payments).

### 2.

The government argues that no governmental entity could promise that the tax benefits or any other aspect of the Assistance Agreement would never be changed. Indeed, we do not hold that Congress cannot act in a way that affects existing government contracts, and we do not assess the merits of the Guarini Legislation. In Winstar, 518 U.S. at 881, the Court responded to a similar argument and explained: "The Government's position is mistaken, however, for the complementary reasons that the contracts have not been construed as binding the Government's exercise of authority to modify banking regulation or of any other sovereign power, and there has been no demonstration that awarding damages for breach would be tantamount to any such limitation."

The issue is not whether Congress can enact legislation that abrogates or modifies existing government contracts; the issue is whether the government is liable for the consequences of such action. While a contract does not prevent Congress from enacting legislation, the government may incur liability for damages when the legislation materially affects performance of the contract. Winstar, 518 U.S. at 870; see Mobil Oil Exploration, 530 U.S. at 619-20 ("the fact that Interior's repudiation rested upon the enactment of a new statute makes no significant difference"). When the government as contracting party makes a promise in exchange for a benefit, it is bound by mutual obligations, as any party to a contract is bound.

The Guarini Legislation was described at the time of enactment as a remedial action implementing a change in policy. It was directed at existing contracts to which the government was a party, and retroactively abrogated contract provisions entered into under the prior policy. As observed in Centex, 395 F.3d at 1306, "the Guarini amendment was the paradigm of targeted tax legislation." The Court of Federal Claims correctly held that the United States is liable for the financial consequences of this action as it affected existing contracts.

### 3.

The "doctrine of unmistakability" is explained in Winstar, where the Court makes clear that when the government enters into a contract with a private person, the government is not precluded from acting in its sovereign capacity notwithstanding the contract unless there is an unmistakable promise not to act; but neither is the government immune from damages incurred as a result of the legislation. The Court explained that the application of the unmistakability doctrine varies "according to the different kinds of

obligations the Government may assume and the consequences of enforcing them." 518 U.S. at 880.

The government argues that this means that Nationwide must accept the consequences of the Guarini Legislation, because there is no unmistakable promise in the contract to exempt Nationwide from future congressional action. The Court of Federal Claims did not agree, and explained that the question of unmistakability "cannot be resolved in isolation from the question of whether the alleged breaching statute is a sovereign act," quoting Coast-to-Coast Financial Corp. v. United States, 45 Fed. Cl. 796, 803 (2000). The government proposes that the unmistakability doctrine and the sovereign acts doctrine are separate, and that the Centex court, like the Court of Federal Claims, erred in stating that "[a] prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated." Centex, 395 F.3d at 1307 (citing Winstar, 518 U.S. at 879). The court in Centex explained that "[t]he enactment of the Guarini amendment cannot be regarded as a sovereign act because it was not generally applicable legislation in form or substance, but was specifically targeted at appropriating the benefits of a government contract." 395 F.3d at 1308.

We have reviewed the matter, and agree that the doctrine of unmistakability is not here applicable. Congress was not bound to refrain from enacting a regulatory measure to remedy perceived abuses in the FDIC-initiated savings and loan administration. The issue is not whether Nationwide must comply with the Guarini Legislation, for it has so complied; the issue is whether the government can be held liable in damages for the economic effect of the abrogated contract provisions. The Court in Winstar explained that "a requirement to pay money supposes no surrender of sovereign power by a sovereign with the power to

contract." 518 U.S. at 881. Analogy to Winstar makes clear that the obligation of the government to pay damages caused by the Guarini Legislation is not inimical to the nature of the contract. The Court of Federal Claims correctly held in Nationwide III that the government is liable in damages for this breach.

**D**

As damages, the Court of Federal Claims required the government to pay Nationwide the 10% of the covered asset losses that had been withheld from reimbursement in accordance with the Assistance Agreement. The court called this remedy a form of "partial restitution," explaining that "there are situations in which a fair solution requires partial rescission or equivalent relief, and a failure to recognize this can result in manifest injustice." Nationwide III, 51 Fed. Cl. at 769 (quoting George E. Palmer, The Law of Restitution §12.6(d)) (1978).

The government argues that restitution is not an available remedy unless there was a "total breach" or repudiation of the entire contract, requiring termination of all performance by both parties. The government argues that because Nationwide continued to perform its contractual obligations after enactment of the Guarini Legislation, and continued to accept payment of only 90% of covered asset losses for the five thrift institutions, Nationwide waived recovery of the lost tax benefits. However, a non-breaching party is not required to create an even worse situation by abandoning all performance in order to preserve access to remedy. As explained in the Restatement (First) of Restitution §68, comment b, a non-breaching party does not waive the right to restitution "where he continues to perform only for the purpose of preserving what he has already invested in the performance." Also, Nationwide promptly protested the Guarini Legislation, filing suit first against the FDIC and

then against the United States. The Court of Federal Claims correctly held that Nationwide's continuing performance was not a waiver of the right of recovery for the government's breach.

The government also argues that the proper remedy (if remedy is held to be warranted) should be measured as expectation damages. The Court of Federal Claims deemed expectation damages unreliable and imprecise in this case, for it would require projection into the uncertain future as well as requiring hypothetical reconstruction of the past. Thus the court held that expectation damages could not be determined with reasonable certainty. See Restatement (Second) of Contracts §352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.") This court has held that when expectation damages in the savings and loan context would be too speculative or indeterminate due to the complexities of the transactions, "the law provides a fall-back position for the injured party -- he can sue for restitution." Glendale Fed. Bank v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001).

We agree with the Court of Federal Claims that it is preferable to apply a measure of damages that can be reasonably determined, as against a measure that cannot be established with reasonable certainty. The court recognized that the parties had "negotiated to convert one-third of the anticipated tax savings into a reduction in reimbursements," Nationwide III, 51 Fed. Cl. at 768, and awarded this reduction as a reasonable and fair measure of damages in that it balanced those parts of the contract consideration and benefits that are most readily related. Id. at 767-68. We discern no error in the court's analysis and resolution. The decision as to the measure of damages is affirmed.

**E**

The government argues that the damages, even if measured by the 10% withheld reimbursement, are nonetheless subject to reduction. The government states that the award should be reduced by the payments by the FDIC to Nationwide in settlement of the litigation with the FDIC. The government also argues that the settlement payment for differences in the book and tax basis of covered asset losses should be deducted, and that the damages now assessed should be reduced by any covered asset gains. The Court of Federal Claims held that the sections of the Assistance Agreement dealing with covered asset gains and covered asset losses were distinct and that the Guarini Legislation affected only covered asset losses. Nationwide points out that the Termination Agreement with the FDIC exempted any future action against the United States arising from breach of the Assistance Agreement caused by the Guarini Legislation, and that the settlement with the FDIC related to other matters. We discern no error in the ruling of the Court of Federal Claims that the settlement payment by FDIC did not include damages flowing from the Guarini Legislation and ensuing breach of the contractual tax benefits.

The government also argues that the trial court erred in including in the damage base the covered asset losses of a Nationwide subsidiary, specifically, the tax treatment of the Centennial Mortgage Corporation for the period before the FDIC purchased Centennial from Nationwide. Nationwide contends, and the Court of Federal Claims held, that the Guarini Legislation applied to these losses, and that "there was no 'wash' to the consolidated entity." Nationwide IV, 56 Fed. Cl. 447. Contrary to the government's position, Nationwide by consolidated return could include the covered asset losses of subsidiaries.

We have considered all of the government's arguments, and discern no reversible error in the rulings of the Court of Federal Claims.

SUMMARY

Section 4.2 of the Termination Agreement preserved the right of suit against the United States flowing from the Guarini Legislation. The Assistance Agreement including its tax provisions was a valid contract, and the obligation of good faith and fair dealing was breached by the Guarini Legislation. The remedy in this case was reasonable, and the withheld 10% reimbursement of covered asset losses is an appropriate and fair measure of damages.

AFFIRMED