**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 03–2209C.

United States Court of Federal Claims.

Nov. 25, 2008.

Peter V. Baugher, Schopf & Weiss LLP, Chicago, Illinois, for the plaintiff. Of counsel, William B. Berndt, Schopf & Weiss LLP, Chicago, Illinois.

Douglas K. Mickle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jeanne E. Davidson, Director and Brian M. Simkin, Assistant Director, Commercial Litigation Branch. Of counsel, Gregory G. Gustin, Maria T. Baguio, Russell J. Cohen, and Lorraine C. Shoto, Office of General Counsel, United States Department of Housing and Urban Development, Chicago, Illinois.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The court issued an earlier opinion on Englewood Terrace Limited Partnership's (Englewood) breach of contract claim, finding the liability issue in favor of the plaintiff. *See Englewood Terrace Ltd. P'ship v. United States,* 79 Fed.Cl. 516 (2007). The extensive findings of fact in the court's earlier opinion will not be repeated here, but are incorporated into this opinion. A few of the relevant facts specifically related to this opinion are repeated below. Englewood alleged that the United States Department of Housing and Urban Development (HUD) breached a Housing Assistance Payment (HAP) contract between Englewood and HUD. The HAP contract provided for rent subsidies to be used by the tenants of South Pointe Towers, a high-rise apartment building in Chicago, Illinois. South Pointe was owned by the Englewood Terrace Limited Partnership. John J. Hayes was the President of P.M. Group, the Englewood Terrace Limited Partnership's general partner, until December 13, 2002. Mr. Hayes' P.M. One was the managing agent at South Pointe. On December 13, 2002, DSSA New Englewood Terrace LLC (DSSA), a sole proprietorship of Don S. Samuelson, replaced P.M. Group as Englewood's general partner. Earlier, on December 1, 2001, Mr. Samuelson's DSSA Management, Inc., which was affiliated with Mr. Samuelson's DSSA New Englewood Terrace LLC, replaced P.M. One as South Pointe's managing agent.

Englewood's complaint stemmed from HUD's termination of Englewood's HAP contract with HUD. The HAP contract at South Pointe ended on September 30, 2002, after tenants had been given housing vouchers permitting them to either remain at South Pointe or relocate to other housing. HUD based its termination of the HAP contract on its belief that Englewood had not provided decent, safe and sanitary housing to tenants, as required by the HAP contract.

The specific basis for the termination of the HAP contract was a March 2, 2001 HUD inspection of South Pointe. After a trial in the matter, this court found, however, that HUD's decision to terminate Englewood was made even before HUD received Englewood's plan to correct deficiencies identified in the March 2, 2001 HUD inspection. The court concluded that Englewood was not afforded a full and meaningful opportunity to cure the deficiencies identified in the March 2, 2001, HUD inspection. The record reflects that, on the one hand, HUD had urged that South Pointe be placed under new management and new ownership, but that, once new management and ownership was in place, there appeared to be a reluctance on the part of HUD to provide a meaningful opportunity for the new management and ownership, in the person of Mr. Samuelson, to take corrective action, or for HUD to even acknowledge any improvement at South Pointe. HUD's posture thereby undermined its contract termination action against Englewood.

After the trial on liability, the court afforded the parties an opportunity to settle any remaining issues, including damages. In addition to the contract termination issue, Englewood also had made separate claims for a rent increase at South Pointe, and for energy cost reimbursement, on which the court required separate briefing from the parties. These two claims are the subject of this opinion.

Mr. Samuelson sent an August 21, 2001 letter to Edward J. Hinsberger, the Director of HUD's Chicago Multifamily Hub, titled, "Contract Renewal and Budget Based Rent Increase for South Pointe Apartments," on

DSSA Management, Inc. letterhead, indicating that DSSA, Inc. intended to obtain a partnership interest in Englewood, and that DSSA Management, Inc. intended to become the managing agent for South Pointe. Mr. Samuelson's letter also stated that South Pointe had not had a rent increase since 1998, and requested an increase, with "rent levels increased to market comparables." Mr. Samuelson's justification for the rental increase stated:

First, South Pointe is operating in 2001 on a 1998 income schedule. There have been three years without a rental increase. Second, Operations have resulted in deficits of approximately $200K a year in 1999 and 2000. Gas costs have risen dramatically over the past year. While vacancy and collection losses, and legal and security costs can be reduced in the future after the improvement program has been put in place, they will not be able to be reduced meaningfully during the remainder of 2001 and 2002. Third, rent comparables in the neighborhood support an average rental increase of $56 per unit per month. Such an increase would increase income potential by $200K per year, enough to offset the operating deficits that have been experienced in past years.

Mr. Samuelson included a Rent Comparability Study with his request for a rent increase. A September 5, 2001 internal HUD e-mail reflected that a desk review of this Rent Comparability Study for South Pointe was conducted, and that the Study was found to be acceptable. As a result, in a September 6, 2001 e-mail to Mr. Samuelson, titled "South Pointe Comparability Study," Mr. Hinsberger wrote that the requested rent increase was supported by the rent comparability survey, but that the request needed to be signed by the owner, Mr. Hayes, and resubmitted. Mr. Hayes' recollection was that he had signed a request for the rent increase, however, Mr. Hinsberger stated that HUD never received a rental request signed by Mr. Hayes. Neither party has produced a document signed by Mr. Hayes.

The second issue addressed in this opinion is reimbursement for higher energy costs. On May 10, 2001, Mr. Hinsberger, Director of HUD's Chicago Multifamily Hub, issued guidance to the office's assigned property owners, including Englewood, concerning potential reimbursement of their higher energy costs incurred during the winter of September 2000–March 2001. Mr. Hinsberger informed property owners that energy reimbursement requests must be submitted before September 30, 2001. In response to this HUD Guidance, on August 6, 2001, Englewood submitted a request for energy reimbursement in the amount of $55,230.29, but without supporting invoices. Subsequently, in a second letter to Mr. Hinsberger, dated May 31, 2002, replacing the first letter, Englewood requested reimbursement for energy costs in the amount of $139,187.35, this time with some, but not all of the supporting invoices required by HUD.

## DISCUSSION

*Rent Increase*

■■■ Englewood argues that it sought a rent increase at South Point from HUD in the amount of $203,828.00 per year, or a total of $611,484.00 for three years. In this regard, Mr. Samuelson, at a point in time when he was neither the owner nor the manager of South Pointe, submitted a rent increase request to HUD dated August 21, 2001. Mr. Samuelson subsequently became the manager at South Pointe on December 1, 2001, and later became the owner on December 13, 2002. The government notes that the rent increase request received by HUD was signed by Mr. Samuelson, and not by the owner of South Pointe at the time, Mr. Hayes.

Edward Hinsberger, the Director of the Chicago Office of Multi–Family Housing for HUD, responded to Mr. Samuelson's rent increase request by e-mail on September 6, 2001, as follows:

[To] Don [Samuelson],

The rent comp study supports the proposed rents. The submission was made by you. It needs to be signed by the owner or the current managing agent. There was a spot on your 8/21/01 letter authorizing you to submit, but Mr. Hayes didn't sign it. Please resubmit the 8/21/01 letter

with John Hayes' signature. We will allow the new rents to kick in at the time of closing.

[From] Ed [Hinsberger]

(brackets added).

Mr. Hinsberger testified at the trial of this case that no rent increase request signed by the owner was ever received:

Q  Okay. And what was your response to the rent increase request?

A [Mr. Hinsberger] The rent increase was returned or the rent increase couldn't be processed for a few reasons. A major reason was the owner didn't sign the submission. There's a spot for the owner's signature at the bottom of the letter, but the owner hadn't signed it. And there was also some confusion because on the same day that I sent out this e-mail, I also met with the management company that was managing the project and that's when they were complaining to me that they were confused. They didn't know what was going on, you know. They didn't know who Mr. Samuelson was and, you know, they had the responsibility for managing the project, so they were, they wanted me to explain to them what was going on.

Q  Okay. Now you, did you ever receive a request resubmitted with the owner's signature or initials at the bottom of it?

A [Mr. Hinsberger] For the rent increase?

Q  For the rent increase request, yes.

A [Mr. Hinsberger] No.

Mr. Hayes' testimony at trial on the rent request differs from Mr. Hinsberger's testimony:

Q  Did you ask Mr. Samuelson to send this letter [the August 21, 2001 rent request]?

A [Mr. Hayes] Yes.

Q  Why did you do that?

A [Mr. Hayes] Well, he was in the process of completing this due diligence on the property. He was very close to it. We had, I had a good feeling that we would enter into an contract for Mr. Samuelson to purchase the general partner interest and I wanted to help him in any way I could to get us to that point. And one of those was that he felt he wanted to ask for a rent increase which hadn't been given in over three years so I encouraged that. And he was closer to the property at that time on a daily basis of where the comps were for rents and the like.

\* \* \*

Q  Did you sign this document? When I say this document, I mean the original of the letter that went out to Mr. Hinsberger?

A [Mr. Hayes] I believe I did.

Ms. Baguio [government attorney]: Objection, your Honor. Best evidence rule, there is nothing in any of the exhibit binders that has such a copy of any such document.

Judge Horn: I think the question is okay if he recollects that he signed it. The form of the question may have been a little bit rough. Do you recollect signing a letter like this?

The witness [Mr. Hayes]: Yes, I do.

In the above-quoted exchange, Mr. Hayes moved from a position of, "I believe I did" sign the August 21, 2001 rent increase request, to a position of, "Yes, I do" recollect signing the letter. Although both parties have had ample time to locate a copy of the letter, which Mr. Hayes states he signed, neither party has been able to provide the court with even a single copy. The August 21, 2001 rent increase request in the record contains only Mr. Samuelson's signature, which supports Mr. Hinsberger above-quoted recollection of receiving a rent request letter only with Mr. Samuelson's signature on it. Mr. Hinsberger also remembered asking for Mr. Hayes' signature on the rent request as the owner, which is supported by a copy of his e-mail to Mr. Samuelson, also in the record. Mr. Hinsberger testified that he never received a rent request with the owner's signature on it. Consistent with Mr. Hinsberger's testimony, extensive discovery by both parties did not produce for the record either the original, or a copy, of an August 2001 rent increase request signed by Mr. Hayes. In balancing the two witnesses,

the court found the testimony of Mr. Hayes less reliable on this point than that of Mr. Hinsberger. Mr. Hinsberger's testimony, but more particularly the presence in the record of the Samuelson-signed rent request without Mr. Hayes' signature, and the absence in the record of a Hayes-signed rent request, leads the court to the conclusion that plaintiff has not demonstrated by a preponderance of the evidence that Mr. Hayes signed the rent request in question.

Plaintiff, nevertheless, argues that Mr. Samuelson was acting on behalf of Mr. Hayes, and that there was no requirement for Mr. Hayes as the owner to sign the rent increase request in the first place, in spite of Mr. Hinsberger's request that owner Hayes do so. With this argument, plaintiff effectively argues that it may ignore HUD's request that the owner sign the request. In this regard, Mr. Hinsberger testified that his reason for asking Mr. Hayes to sign the rent increase request was that, "there was also some confusion because on the same day that I sent out this e-mail, I also met with the management company that was managing the project and that's when they were complaining to me that they were confused. They didn't know what was going on, you know. They didn't know who Mr. Samuelson was and, you know, they had the responsibility for managing the project, so they were, they wanted me to explain to them what was going on." The record reflects that, at the time the rent request was submitted to HUD, in August 2001, Mr. Samuelson was neither the owner nor the manager of South Pointe. Furthermore, Mr. Samuelson submitted the rent increase request on his own letterhead, DSSA Management, Inc., which at the time of the submission had no ownership or management role with South Pointe.

The text of Mr. Samuelson's rent request itself noted that DSSA Management, Inc. was not the owner, nor the manager and, further, conditioned future ownership by DSSA Management, Inc. and Mr. Samuelson to a contingency—a future agreement to be negotiated and executed with the current General Partner of owner Englewood Terrace Limited Partnership, P.M. Group, and with the Limited Partner of owner Engle-wood Terrace, Chevron Corporation. Under these circumstances, HUD's requirement for the current owner to sign the rent increase request was reasonable. By signing the request, Mr. Hayes would have ratified the data contained in the letter and the request for a rent increase at a point when Mr. Samuelson and DSSA had not taken over the South Pointe housing project.

Mr. Samuelson's letter also states that Mr. Samuelson is seeking the rent increase under "Option 2 of the Section 8 Renewal Guide." Chapter Four of the cited Section 8 Renewal Guide, formally titled "Section 8 Renewal Policy: Guidance for the Renewal of Project–Based Section 8 Contracts," signed by William C. Apgar, Assistant Secretary for Housing–Federal Housing Commissioner and dated June 19, 2001, repeatedly states that the "the Owner submits" the required documents for a rent increase, which supports HUD's action of requiring a signature by owner Hayes. Consistent with this language in the cited HUD Section 8 Renewal Guide, Mr. Samuelson's letter had a typed signature block which began, "Acknowledged and Agreed To," "By: John Hayes," "For and on behalf of PM Group." The signature block for Mr. Hayes is blank in the copy of the letter in the record before the court.

Moreover, Mr. Samuelson's rent increase letter also contains the caveat that, since DSSA is not the owner of the property, Mr. Samuelson's and DSSA's "certification as to the reasonableness of expenses is based on information provided to us to the extent such information is available. No independent judgment can be made until such time as the property has been acquired and managed by DSSA." Mr. Samuelson had a reason for providing this caveat in his rent increase letter. The income and expense projections supporting the requested rent increase require a certification "that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate," and a warning that HUD will prosecute false claims and statements. In the copy of the document in the record, there is a place for a signature and date under this certification language which is blank, not having been signed by

Mr. Samuelson, who apparently declined to vouch for the data in the rent request. In the copy of the document in the record, Mr. Samuelson signed the cover letter, but would not vouch for the data in the rent request package he submitted. Under these facts and circumstances, the court finds that HUD's requirement for the current owner to sign the request was practical, business-like and reasonable. It would not have been responsible for HUD to have proceeded without Mr. Hayes' signature and certification of the underlying data for the rent increase request. Nor will the court require such a result.

■ Defendant also argues that Englewood waived its right to a rent increase, memorialized in Mr. Samuelson's August 21, 2001 rent increase letter, when Englewood agreed to rents in the September 2001 HAP renewal contract. Mr. Hayes signed this HAP renewal contract, as the project owner, a month after Mr. Samuelson's letter, on September 26, 2001. The renewal contract period was for three months, from October 1, 2001 to December 31, 2001. There was no increase in rent in this renewal contract. The same rents effective October 1, 2001 are found in the earlier HAP contract which expired September 30, 2001. Defendant argues that Mr. Hayes could have objected to the rent, but did not do so, and instead signed the renewal contract on September 26, 2001. Defendant characterizes Mr. Hayes' posture as a waiver of the right to challenge the rent later, citing *Whittaker Electronic Systems v. Dalton,* 124 F.3d 1443, 1446 (Fed.Cir.1997) ("The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR [Defense Acquisition Regulation] or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge.") (citing *United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed.Cir. 1997) and *E. Walters & Co. v. United States,* 217 Ct.Cl. 254, 576 F.2d 362, 367–68 (1978)), *reh'g denied and en banc suggestion declined* (Fed.Cir.1997); *see also Am. Tel. & Tel. Co. v. United States,* 307 F.3d 1374, 1381–82 (Fed.Cir.2002), *reh'g en banc denied* (Fed.

Cir.), *cert. denied,* 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003).

Plaintiff responds that the court has already addressed, and rejected, defendant's argument, citing the court's earlier opinion, *Englewood Terrace Limited Partnership v. United States,* 79 Fed.Cl. at 533–35. However, the rent increase which is being addressed in this present opinion was not decided in the court's earlier opinion. What was decided, instead, in the earlier opinion, was that no consideration had been provided to Englewood by the government to cover the conversion of what essentially was a four-year contract term in the 2000 HAP contract to a series of shorter terms which did not add up to the original four years. *Id.* at 533–35. Englewood effectively had a four-year contract, and ended up with considerably less, without consideration. Englewood is not in the same posture with respect to rent increases. The rent increase issue has been separately briefed from the contract issue and is addressed in this opinion. Englewood did not, for example, have a contract for higher rent payments which were then reduced in mid-contract to lower rents, without consideration being provided by the government. Defendant's assertion that plaintiff waived its objection to the rent is well taken. Mr. Hayes signed the 2000 HAP contract, and agreed to the rents contained therein. The rent component of the 2000 HAP contract was not blank or open ended, but definite. It is anomalous for plaintiff to seek rents different from those to which Mr. Hayes agreed and executed. Because Mr. Hayes cannot demonstrate that he signed the request for a rent increase and, independently, because he subsequently agreed to the rents specified in the 2000 HAP contract, Englewood's claim based on a rent increase is denied.

Plaintiff also argues that "HUD was *required* to adjust the rents at Englewood" by section 524(c) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA), Pub.L. 106–74, § 531, 113 Stat. 1109, 1113 (1999). (emphasis in original).

Section 524(c) states that:

Rent Adjustments After Renewal of Contract.—

(1) Required—After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.

MAHRA, Pub.L. 106–74, § 531, 113 Stat. 1109, 1113. Defendant notes that Englewood's budget-based rent increase must be based, in the words of the last two lines of section 524(c), quoted above, "upon the request of the owner," and subject to the approval of the Secretary of HUD. The court determined earlier that Englewood failed to demonstrate that there was a "request by the owner," Mr. Hayes, for a rent increase, such that plaintiff's section 524(c) argument is rejected. The court concludes that Englewood has not demonstrated that it is entitled to the claimed rent increase.

*Energy Reimbursement*

█ On April 20, 2001, a senior official at the United States Department of Housing and Urban Development, Washington, D.C., provided "Guidance for Processing Rental Adjustments for Escalating Energy Costs" to regional HUD officials, including Mr. Hinsberger, the Director of HUD's Chicago Multifamily Hub. Mr. Hinsberger placed a May 10, 2001 cover memorandum on the April 20, 2001 HUD energy program guidance, and sent his memorandum with the HUD program information to the owners and managing agents of multifamily housing projects under his jurisdiction, including Englewood. Mr. Hinsberger's memorandum to property owners stated as follows:

> Transmitting herewith is information that should be used by owners and/or agents of multifamily housing projects who have experienced an increase in utility cost during

the months of October 2000 [1]—March 2001.

Sean G. Cassidy, General Deputy Assistant Secretary for Housing—Deputy Federal Housing Commissioner, has issued the attached memorandum and the applicable documents in an effort to assist you in dealing with escalating energy costs.

The guidance provides for a **one-time, lump sum adjustment** that will be used for increased utility cost. If you qualify for this adjustment, you must submit your request before September 30, 2001.

Please carefully review this information prior to submitting your request. If you have any questions concerning this matter, contact your respective project manager.

(emphasis in original).

In response to this HUD energy program information, on August 6, 2001, Englewood submitted a request for energy cost reimbursement in the amount of $55,230.29, but without any supporting invoices. Subsequently, in a May 31, 2002 letter to Mr. Hinsberger, Englewood submitted another energy request for the same period as the first request, September 2000–March 2001, seeking $139,187.35, and this time including some but not all of the supporting invoices required by the April 20, 2001 HUD energy program information. The second Englewood letter stated:

> The PM Group submitted a timely request for the "Rental Adjustments for Escalating Energy Costs" on August 6, 2001. It is attached as Exhibit A. A Rent Comparability Study was also completed and submitted to HUD in August of 2001.
>
> DSSA has developed an updated version of this Rental Adjustment based on the detailed backup information provided by Peoples Energy Services Corporation. The calculations and backup data is [sic] contained in Exhibit B. The amount of this amended and updated request for reimbursement is $139,187.

---

1. Though Mr. Hinsberger's May 10, 2001 memorandum stated the reimbursable period as October 2000–March 2001, the attached April 20, 2001 HUD energy program information stated that the reimbursable period was September 1, 2000–March 31, 2001. Both of Englewood's submissions used the correct September 1, 2000–March 31, 2001 time period, without objection from defendant.

Defendant argues that "Englewood failed to comply with the stated terms of the program to be eligible for these [energy reimbursement] funds." In particular, defendant draws the court's attention to Englewood's August 6, 2001 energy cost submission. On the "Energy Lump Sum Cost Worksheet, Attachment 1," under "Total Utility Increase Amount," Englewood entered the figure of $55,230.29. Immediately under this figure the Energy Worksheet itself stated: "Attach September 1999–March 2000 invoices and September 2000–March 2001 invoices to support increased amounts." The purpose of the invoices was to support a figure for the energy costs for the prior winter, the "control winter," September 1999–March 2000, in order to compare that figure to the higher energy costs for the "reimbursable winter," September 2000–March 2001. The lower energy costs for the prior "control winter" are subtracted from the higher energy costs for the "reimbursable winter" to compute the increase in energy costs for which reimbursement is sought. No invoices, however, were attached to Englewood's August 6, 2001 submission, which was otherwise timely, having been received by the September 30, 2001 deadline.[2]

Defendant acknowledges that the second energy cost application submitted to HUD on May 31, 2002, seeking $139,187.35 in increased energy costs from the "control winter" to the "reimbursable winter," included supporting invoices for the "reimbursable winter" (September 2000–March 2001), but, notes that, again, no supporting invoices were submitted for the prior winter (September 1999–March 2000). Invoices also were included for a period outside the energy reimbursement period, November 2001–March 2002, which are not useful for the energy reimbursement calculation. A "Customer Activity Report" was included by Englewood

in its May 31, 2002 submission. This summary report reflected the charges from the invoices and the corresponding payments by Englewood, though the figures did not appear to match the invoices in every instance. The invoices dated October 24, 2000, November 22, 2000, and December 21, 2000 matched the amounts included on the Customer Activity Report, but the invoices dated January 17, 2001, February 23, 2001, March 21, 2001, and April 17, 2001 did not match the amounts for those same invoices on the Customer Activity Report. The total of the invoices for the "reimbursable winter" ($246,107.46) did not match the total on the Customer Activity Report ($247,891.25), and neither figure matched the total Englewood included on its May 31, 2002 Energy Worksheet ($248,391.05). Furthermore, the figures on Englewood's August 6, 2001 submission differed from the figures on the May 31, 2002 submission, for both the "control winter" of September 1999–March 2000 and the "reimbursable winter" of September 2000–March 2001. No invoices for September 1999–March 2000 were included on either the August 6, 2001 or the May 31, 2002 energy submissions, such that the requested reimbursements could not be verified on either submission. Thus, the court concludes that both energy submissions by Englewood were incomplete.

Englewood's response is reminiscent of its rent increase argument, disposed of above, that, even though Mr. Hinsberger had asked for the owner's signature on the rent increase request, Englewood need not provide it. For energy reimbursement, even though Mr. Hinsberger stated to Englewood and the other property owners within his jurisdiction that, "you must submit your request before September 30, 2001," Englewood argues that this deadline, similarly, could be ignored. Englewood argues that the September 30, 2001 deadline emanated merely from "the

---

**2.** Defendant joined Englewood in a stipulation that Englewood had submitted its initial request for energy reimbursement on August 6, 2001, a date prior to Mr. Hinsberger's September 30, 2001 deadline for application submission. Defendant, however, in its brief, maintains "that there is no evidence that HUD ever received the request in 2001." Nevertheless, Mr. Hayes did testify at trial that the energy reimbursement request was sent to HUD, and that he subsequently received a response from HUD that the request would not be paid, indicating that the August 6, 2001 application had been received by HUD. Furthermore, a signed copy of the request, dated August 6, 2001, is contained in the record. The court concludes that Englewood submitted an energy reimbursement request prior to Mr. Hinsberger's September 30, 2001 deadline, albeit incomplete.

say-so of Mr. Hinsberger," and not from any statute or regulation with which Englewood would have to comply. Nevertheless, Englewood did attempt to comply with the deadline, submitting its first application on August 6, 2001.

In support of its argument that it could ignore Mr. Hinsberger's deadline, Englewood cites to the case of *St. Christopher Associates, L.P. v. United States,* 511 F.3d 1376 (Fed.Cir.2008). St. Christopher Associates was the owner of an apartment complex for the elderly which sued HUD in the United States Court of Federal Claims because HUD had failed to consider the owner's request for a rent increase. *Id.* at 1378. The United States Court of Appeals for the Federal Circuit identified a HUD regulation and handbook, both of which stated that HUD must consider an owner's request for a rent increase. *Id.* at 1382–83. The HUD handbook also set a time period within which HUD was to respond to a rent request. *Id.* at 1383. However, the Federal Circuit further found that neither the regulation nor the handbook were incorporated into the Regulatory Agreement between St. Christopher Associates and HUD, which St. Christopher had alleged was breached. *Id.* at 1385. "In sum, there is simply no Federal Circuit precedent holding that it is proper to read into a contract statutes, regulations, or agency guidance when they are not incorporated by reference into the contract." *Id.* at 1384 (footnote omitted). The Federal Circuit contemplated a contract explicitly incorporating provisions, in order to be required under the contract, and not an incorporation by implication. *Id.* at 1384 (citing *Smithson v. United States,* 847 F.2d 791, 794 (Fed.Cir.1988)). With *St. Christopher Associates* in mind, Englewood argues that Mr. Hinsberger's letter with the September 30, 2001 deadline and the requirement for supporting invoices were not incorporated into Englewood's HAP contract, and that these terms, therefore, are unenforceable.

Defendant, noting the fate of the regulation and handbook, which had not been explicitly incorporated into the Regulatory Agreement between the parties in *St. Christopher Associates,* agrees that the HUD energy program in the present case was "not incorporated into any of the parties' agreements" and, therefore, is not a contractual commitment. The court, however, distinguishes the facts of this case from *St. Christopher Associates,* and comes to a different conclusion. In *St. Christopher Associates,* the owner was the moving party, seeking a rent increase which HUD refused to consider. The Federal Circuit found that HUD did not have to comply with a regulation and a handbook, which mandated a timely review of rent increase requests from owners, because the regulation and handbook were not explicitly incorporated into the owner's HAP contract. *See St. Christopher Assocs., L.P. v. United States,* 511 F.3d at 1383–85. In contrast, in the present case, HUD established the one-time energy cost reimbursement program at issue, which was accepted by Englewood by word and deed (by submitting two applications). Rental adjustments to the HAP contract were explicitly contemplated in the very title to the April 20, 2001 HUD energy program materials: "Guidance for Processing *Rental Adjustments* for Escalating Energy Costs." (emphasis added). These contemplated rental adjustments did not stand alone, but required the existence of an underlying HAP contract and, when approved became a supplement to that contract. In fact, the title of Englewood's application, using required energy program materials, reflects, explicitly, the supplement to the HAP contract: "Project-based Section 8, FEDERAL FISCAL YEAR 2001, ENERGY LUMP SUM ADJUSTMENT, SUPPLEMENT TO HAP CONTRACT." (emphasis in original).

The HUD energy program information continued this theme:

2. PURPOSE OF SUPPLEMENT

a. This is a *supplement to the Section 8 Renewal Contract* between the owner and the contract administrator for the project identified above.

b. Subject to the availability of sufficient appropriations to make housing assistance payments *in accordance with the Renewal Contract,* as determined by HUD, HUD may consider approving, at HUD's discretion, *a lump-sum energy cost adjust-*

*ment of rents for the contract units,* from budget authority appropriated by the Congress, and available for this purpose. Such adjustment shall only be considered and paid for actual energy costs incurred by the owner during Federal Fiscal Year 2001 with respect to the *Section 8 contract units subject to the Renewal Contract.*

(emphasis added). The HUD energy program information also stated explicitly, "Notice of rent adjustment by the Contract Administrator to the Owner shall automatically constitute an *amendment of the Renewal Contract.*" (emphasis added).

This one-time, energy cost reimbursement cannot be approved without the terms of the HUD energy program, and does not occur outside of and independent of the HAP contract. The terms of this supplemental energy program include a September 30, 2001 deadline for submission of applications, supporting invoices for the "control winter" and the "reimbursable winter," and broad discretion residing in HUD on approval of any energy cost reimbursements. In this last regard, the government's discretion is not unfettered, but must be exercised reasonably and in good faith.

The United States Court of Appeals for the Federal Circuit has stated that:

> The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. The duty applies to the government just as it does to private parties.

*Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2005) (citations omitted); *see also First Nationwide Bank v. United States,* 431 F.3d 1342, 1349 (Fed.Cir.2005);

*Centex Corp. v. United States,* 49 Fed.Cl. 691, 708 (2001) ("All contracts, including government contracts, contain an implied covenant of good faith and fair dealing.") (citations omitted); Restatement (Second) of Contracts § 205 (1881) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

For its part, in the words of plaintiff's counsel, "Englewood accepted HUD's offer" of a one-time, energy cost reimbursement program, thereby accepting its terms. Englewood submitted two different applications pursuant to this HAP contract supplemental program. Englewood's participation in the energy cost reimbursement program included compliance with the terms of the program.

The supplemental energy reimbursement program directed applicants to attach invoices for the September 1999–March 2000 "control winter" and for the September 2000–March 2001 "reimbursable winter." These two sets of invoices were intended to support the computation in the program materials, which derived the increase in energy costs. According to the supplemental program materials, the figure for the lower cost, "control winter" was subtracted from the higher cost, "reimbursable winter" to produce the reimbursable dollar increment. Englewood's August 6, 2001 application was defective in that none of the required supporting invoices were included in the application, for either the "control winter" or the "reimbursable winter." Englewood's May 31, 2002 application submitted a different figure from the first application for the "control winter," but no supporting invoices. The May 31, 2002, second application also had a different figure from the first application for the "reimbursable winter," and included some supporting invoices, indicating familiarity with the explicit requirement for invoices.[3] Englewood's failure to provide all of

---

**3.** In addition to all of the figures in the first application changing in the second application, the second, May 31, 2002 application listed $248,391.05 in energy costs for the "reimbursable winter," but the seven invoices included for the period September 1, 2000 through March 31,

2002 totaled $246,107.46, and a summary "Customer Activity Report," also included with the second application, listed the same seven invoices for the "reimbursable winter," but with a total figure of $247,891.25. These discrepancies

the required invoices in either of its two applications provided a reasonable basis for HUD to deny Englewood's energy cost reimbursement application.

Mr. Hinsberger's May 10, 2001 cover Memorandum established a September 30, 2001 deadline for submission of energy reimbursement applications. The September 30, 2001 deadline was six months after the close of the "reimbursable winter" which concluded March 2001, and a year and six months after the close of the "control winter," which concluded March 2000. The court, therefore, finds the deadline to be reasonable.

Though Englewood appears to have accepted and attempted to comply with the deadline at the time, Englewood now questions Mr. Hinsberger's ability to set such a deadline. Englewood is effectively raising the question of whether Mr. Hinsberger's possessed the authority to set a deadline which was not contained in the original April 20, 2001 HUD supplemental energy program materials from Washington, D.C. *See Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997) (the elements of an express contract include authority on the part of the government representative to bind the government), *reh'g denied and en banc suggestion declined* (Fed.Cir.), *cert. denied,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997); *see also Rick's Mushroom Serv., Inc. v. United States,* 521 F.3d 1338, 1346 (Fed.Cir.2008) (affirming *Rick's Mushroom Serv., Inc. v. United States,* 76 Fed.Cl. 250, 259 (2007)); *United Pac. Ins. Co. v. Roche,* 401 F.3d 1362, 1366 (Fed.Cir. 2005).

In this regard, there was a place on the energy application form, under the owner's signature, for the contract administrator's signature. The HUD supplemental program materials indicated that: "Notice of rent adjustment by the Contract Administrator to the Owner shall automatically constitute an amendment of the Renewal Contract." The court concludes from this that approval of the energy cost reimbursement lay within the HUD Chicago Multifamily Hub and Director Hinsberger's jurisdiction and authority. The HUD supplemental materials also are one reason why supporting invoices were

indicated that, in one special circumstance, not applicable to Englewood, the energy cost reimbursement application was to be sent, through the HUD Chicago Multifamily Hub Director, Mr. Hinsberger, to another HUD office for processing and approval. The example given was properties that closed under the Portfolio Reengineering Demonstration Program (PRDP). PRDP properties "must submit the request for utility lump adjustment through the HUB Director to Headquarters, Office of Housing Assistance and Grant Administration," and to a specific, named individual. Normal applications, however, such as Englewood's, were to be processed as adjustments to rent, within the HUD Chicago Multifamily Hub. The court finds that the authority to solicit, receive, process, and approve applications within the Chicago Multifamily Hub included the authority to establish a reasonable deadline for the submission of applications. In the present case, Mr. Hinsberger, as the Director of the Chicago Multifamily Hub, established a reasonable deadline, September 30, 2001, for applications, a condition which Englewood accepted at the time, as evidenced by the fact that Englewood submitted an application on August 6, 2001, albeit incomplete (without invoices) and, also apparently, incorrect, since all of the figures on Englewood's first application were revised by Englewood on its second application, dated May 31, 2002.

In the alternative, even if Mr. Hinsberger did not possess the authority to set a reasonable deadline for submission of applications, Englewood's failure to comply with the invoice requirement, on both of its applications, provided a reasonable basis for the denial of its energy reimbursement claim. The terms of the supplemental energy program explicitly entrusted considerable discretion to HUD in the implementation and approval of energy reimbursements. The program materials, for example, stated that:

> Effective immediately, the Department *will consider* providing temporary, emergency utility cost relief, *at HUD's discretion,* for units where contract rents are paid pursuant to a HAP contract that has required.

been renewed under MAHRA, no matter whether the contract rents were last adjusted by an OCAF or on a budget-basis.

\* \* \*

Subject to the availability of sufficient appropriations to make housing assistance payments in accordance with the Renewal Contract, *as determined by HUD, HUD may consider approving, at HUD's discretion,* a lump-sum energy cost adjustment of rent for the contract units, from budget authority appropriated by the Congress, and available for this purpose.

(emphasis added).

The very terms of this special energy reimbursement program characterize it as a discretionary program, and it is well within the discretion afforded HUD by the program to require from applicants invoices to support energy costs for the "control winter" and the "reimbursable winter" and, for that matter, to set a reasonable deadline for applications to be submitted. Englewood's failure to comply with the invoice requirement, alone, provided a reasonable basis for the denial of its energy cost reimbursement application.

The discretion afforded HUD in the supplemental energy program materials, which were accepted by Englewood, is consistent with the discretion defendant argues is afforded HUD under section 524(c) of the Multifamily Assisted Housing Reform and Affordability Act of 1997 (MAHRA). Defendant notes that, "for projects with HAP contracts such as Englewood's, *i.e.*, a contract renewed pursuant to MAHRA, the only authority to grant a rent adjustment for extraordinary energy cost is section 524(c) of MAHRA and is made upon a budget basis. As with a budget-based rent increase request, Englewood was required to timely submit the request and receive HUD approval in order to receive the energy claim as a rent adjustment. No approval was granted by HUD."

Section 524(c) of the MAHRA states that: Rent Adjustments After Renewal of Contract.—

(1) Required.—After the initial renewal of a contract for assistance under section 8 of the United States Housing Act of 1937 pursuant to subsection (a), (b)(1), or (e)(2), the Secretary shall annually adjust the rents using an operating cost adjustment factor established by the Secretary (which shall not result in a negative adjustment) or, upon the request of the owner and subject to approval of the Secretary, on a budget basis.

Pub.L. 106–74, § 531, 113 Stat. 1109, 1113 (1999). The terms of the supplementary energy cost reimbursement program, which is funded through a rent adjustment to the HAP contract, are consistent with the discretion afforded HUD under section 524(c) to approve, or deny, the rent adjustment. The court concludes that Englewood failed to comply with terms of the energy reimbursement program, and that, under the facts and circumstances of this case, the denial of Englewood's claim was well within HUD's discretion.

Defendant adds that, even if Englewood's energy cost reimbursement application had been timely and complete, Englewood would not have been entitled to reimbursement because South Pointe was not in decent, safe and sanitary condition. Defendant cites to HUD's energy cost reimbursement program, which stated that: "In order for owners to take advantage of the opportunity for a utility lump sum adjustment, properties must be acceptably managed and the owner must be in good standing with all Business Agreements signed with the Department." Defendant attempts to make a distinction between the court's earlier determination that termination of Englewood's HAP contract by HUD was improper because Englewood was not afforded a full and fair opportunity to cure deficiencies, and the conditions at South Pointe Towers. Defendant appears to be arguing that even though HUD did not afford Englewood a full and fair opportunity to clean up South Pointe Towers, Englewood should, nevertheless, be denied the opportunity to participate in HUD's energy reimbursement initiative because it was not cleaned up. In its earlier opinion, this court stated: "Defendant, nevertheless, also points out that the energy reimbursement program precluded owners in default from partic-

ipation. However, the court earlier found HUD's default of Englewood to be without a reasonable basis." *Englewood Terrace Ltd. P'ship v. United States*, 79 Fed.Cl. at 551. There are adverse consequences to an owner stemming from the default of a HAP contract, but the default in this case was found, in the court's earlier opinion, to be improper. Similarly, there are adverse consequences to the government stemming from an improper default. Under the circumstances, defendant has not convinced the court that the condition of the property may be used as another basis to deny Englewood's energy reimbursement claim. However, because Englewood did not submit a proper claim for energy cost reimbursement, the claim is denied.

## CONCLUSION

For the foregoing reasons, the court denies plaintiff's claims based on a rent increase and energy reimbursement.

**IT IS SO ORDERED.**